IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN CIVIL LIBERTIES UNION, et al.,    )
                                           )
         Plaintiffs,                       )
                                           )
              v.                           )    Civil Action No. 18-cv-00154-DWM
                                           )
DEPARTMENT OF DEFENSE, et al.,             )
                                           )
         Defendant.                        )

## DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)    I am the Section Chief of the Record/Information Dissemination Section

("RIDS"), Information Management Division[1] ("IMD"), in Winchester, Virginia.  I have held

this position since August 1, 2002.  Prior to my joining the Federal Bureau of Investigation

("FBI"), from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the

Navy for Civil Law.  In that capacity, I had direct oversight of Freedom of Information Act

("FOIA") policy, procedures, appeals, and litigation for the Navy.  From October 1, 1980 to

April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked

with FOIA matters.  I am also an attorney who has been licensed to practice law in the State of

Texas since 1980.

(2)    In my official capacity as Section Chief of RIDS, I supervise approximately 239

employees who staff a total of twelve (12) Federal Bureau of Investigation Headquarters

("FBIHQ") units and two (2) field operational service center units whose collective mission is to

---

[1] In May 2018, the Records Management Division ("RMD") was renamed IMD.

1

effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives.  The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

       (3)     Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a.  Specifically, I am aware of the FBI's handling of Plaintiffs' FOIA request at issue in this litigation.   This declaration is being submitted in order to provide the Court and Plaintiffs with an explanation of the FBI's handling of the Plaintiffs' FOIA request and the FBI's justifications for neither confirming nor denying the existence of records responsive to the Plaintiffs' FOIA request pursuant to FOIA Exemptions (b)(7)(A) and (b)(7)(E), 5 U.S.C. §§ 552(b)(7)(A) and (b)(7)(E).

## PLAINTIFFS' FOIA REQUEST

       (4)     Plaintiffs submitted to the FBI, a FOIA request via facsimile on April 2, 2018, seeking records pertaining to cooperation between federal, state, and local law enforcement entities and between federal law enforcement entities and private security companies concerning preparations for anticipated protests against the Keystone XL pipeline.  Specifically, records created on or after January 24, 2017, concerning:

        1. Legal and policy analyses and recommendations related to law
          enforcement funding for and staffing around oil pipeline

protests. Such recommendations may include, but are not
limited to, declarations of a state of emergency by state and
local entities in order to marshal additional funds, and requests
by state or local entities for federal agencies to provide funding
or personnel for counter-protest operations; and

2. Travel of federal employees to speaking engagements, private
and public meetings, panels, and conferences on the subject of
preparation for oil pipeline protests and/or cooperation with
private corporations in furtherance thereof; and

3. Meeting agendas, pamphlets, and other distributed matter at
speaking engagements, private and public meetings, panels,
and conferences where federal employees are present to discuss
preparation for oil pipeline protests and/or cooperation with
private corporations in furtherance thereof; and

4. Communications between federal employees and state or local
law enforcement entities or employees thereof, and between
federal employees and private security companies or
employees thereof, discussing cooperation in preparation for
oil pipeline protests.

In addition, Plaintiffs requested expedited processing, and cited a "compelling need" for the

records to inform the public concerning actual or alleged Federal Government activity. As a

representative of the news media, Plaintiffs also requested a waiver of fees. **(Exhibit A.)**

(5)    On April 6, 2018, the FBI acknowledged receipt of Plaintiffs' request; assigned it

FOIPA Request No. 1401682-000; advised their fee waiver request was under consideration; and

for duplication fee purposes they were determined news media representatives. The FBI

provided Plaintiffs their right to appeal to the Department of Justice ("DOJ") Office of

Information Policy ("OIP") within 90 days from the date of its letter. **(Exhibit B.)**

(6)    By letter dated April 6, 2018, the FBI provided Plaintiffs standard language that

"unusual circumstances" applied to their request pursuant to 5 U.S.C. § 552(a)(6)(B)(iii).[2]

---

[2] The FBI noted that the "unusual circumstances" application is not a determination of how the
FBI would respond to the substantive request but rather an indication the circumstances of the

**(Exhibit C.)**

  (7)  By letter dated April 24, 2018, the FBI advised Plaintiffs they did not provide

sufficient information concerning the statutory requirements permitting expedition per 28 C.F.R.

§ 16.5 (e)(1)(ii); therefore their request for expedited processing was denied.[3]  The FBI provided

Plaintiffs their right to appeal to the Department of Justice ("DOJ") Office of Information Policy

("OIP") within 90 days from the date of its letter.  **(Exhibit D.)**

  (8)  On September 4, 2018, Plaintiffs filed this lawsuit.  *See* ECF No. 1, Complaint.

  (9)  The FBI provided Plaintiffs a *Glomar* response on January 9, 2019 (inadvertently

dated for 2018), advising it could neither confirm nor deny the existence or non-existence of

responsive records which would tend to disclose the FBI's preparations, strategy, or available

resources for responding to a particular event or activity, including potential protests against the

Keystone XL Pipeline pursuant to FOIA Exemptions (b)(7)(A) and (b)(7)(E), 5 U.S.C.

§§ 552(b)(7)(A) and (b)(7)(E).  **(Exhibit E.)**

***GLOMAR* RESPONSE**

  (10)  The FBI relies on a *Glomar* response in instances in which, assuming

responsive records exist, even acknowledging their existence would result in a harm

protected against by one or more FOIA exemptions.  The FBI must maintain a *Glomar*

response in all similar cases whether or not responsive records exist in order for the

*Glomar* to be credible and effective.  If the FBI were to invoke a *Glomar* only when it

actually possessed responsive records, then the invocation would be interpreted as an

---

request could result in delays to the processing of the request.

[3] 28 C.F.R. 16.5 § (e)(1)(ii): "An urgency to inform the public about an actual or an alleged federal government activity, if made by a person primarily engaged in disseminating information."

4

admission responsive records exist and such response would cease to be effective.

(11)    In this case, Plaintiffs' FOIA request essentially seeks the FBI's "playbook," strategy, and resources for responding to a potential event. To my knowledge, the FBI has neither confirmed nor denied publicly the receipt of any new, credible threats against the Keystone XL pipeline ("pipeline") since President Trump's March 2017 announcement authorizing construction of the pipeline. Nor has the FBI acknowledged taking any new preparatory actions specifically in response to new and potential threats against this pipeline.[4] Merely acknowledging the existence or non-existence of the requested records would require the FBI to confirm or deny detection of one or more specific credible threats to the pipeline. Acknowledgment by the FBI would alert those involved in potential criminal activity against the pipeline of the FBI's assessment into their activities and alert them their activity(ies) triggered a specific investigation to thwart potential threats, thus triggering harm under FOIA Exemptions (b)(7)(A) and (b)(7)(E).

(12)    Acknowledging the existence of responsive records within the categories requested by the Plaintiffs would trigger harm under (b)(7)(A) because the FBI's acknowledgment of the detection of criminal activity would interfere with pending law enforcement investigation(s) by tipping off criminals that certain activities (and perhaps not others) have been detected and thus allow them the ability to take countermeasures to avoid further detection and/or potential prosecution. *See* 5 U.S.C. § 552(b)(7)(A).

---

[4] Although the FBI acknowledged receipt of threats to the pipeline in the past, the investigation(s) and activity(ies) concerning those specific investigation(s) was closed due to former President Obama's denial of the permit for the pipeline and mootness due to ceased construction. Plaintiffs' request only seeks information created after January 24, 2017, post-dating the closure of the prior investigative activities.

Additionally, to acknowledge the existence of responsive records would disclose law
enforcement techniques or procedures used by the FBI, including the effectiveness,
scope, capabilities, and vulnerabilities of the techniques or procedures.  Such a disclosure
could reasonably be expected to risk circumvention of the law.  *See* 5 U.S.C.
§ 552(b)(7)(E).

## FOIA EXEMPTION 7 THRESHOLD

(13)    Before an agency can invoke any of the harms enumerated in Exemption
7, it must first demonstrate the records or information at issue were compiled for law
enforcement purposes.  Law enforcement agencies must demonstrate the records are
related to the enforcement of federal laws and the investigation or activity is within their
law enforcement duty.

(14)    Pursuant to 28 U.S.C. §§ 533 and 534, Executive Order 12,333 as
implemented by the Attorney General's Guidelines for Domestic FBI Operations ("AGG-
DOM"), and 28 C.F.R. § 0.85, the FBI is the primary investigative agency of the federal
government, with authority and responsibility to investigate all violations of federal law
not exclusively assigned to another agency; to conduct investigations and activities to
protect the United States and its people from terrorism and threats to national security;
and to further the foreign intelligence objectives of the United States.

(15)    Responding to Plaintiffs' FOIA request with anything other than a *Glomar*
response, would require the FBI to disclose that credible threats to the pipeline have been
detected and investigative activity is occurring.  Assuming the allegations are true,
records pertaining to the FBI's receipt of, evaluation of, and activity taken in response to
the assessed threat would be part of an ongoing criminal and/or national security

6

investigation within the law enforcement duties of the FBI, and therefore, compiled for

law enforcement purposes.  Accordingly, records responsive to Plaintiffs' request, should

they exist, would readily meet the threshold requirement of FOIA Exemption (b)(7).

**FOIA Exemption (b)(7)(A)**

(16)    5 U.S.C. § 552 (b)(7)(A) exempts from disclosure:

> Records or information compiled for law enforcement purposes, but
> only to the extent that the production of such law enforcement
> records or information…could reasonably be expected to interfere
> with enforcement proceedings.

(17)    Application of this exemption requires: (a) the existence of law

enforcement records; (b) a pending or prospective law enforcement proceeding; and (c) a

determination that release of the information could reasonably be expected to interfere

with the enforcement proceeding.

(18)    The FBI has asserted a *Glomar* response because acknowledging or

denying the existence of records in response to Plaintiffs' FOIA request is tantamount to

confirming or denying the specific triggers that result in detection of a recent or current

credible threat to the pipeline, its construction, and/or those employed to construct the

pipeline and would disclose specific actions the FBI anticipates taking to thwart such a

threat.  Confirming or denying the existence of records provides criminals with insight as

to what actions have been detected, allowing criminals to develop the best possible path

to effectively carryout their criminal activities in ways that circumvent detection.

Therefore, confirmation of responsive records, should they exist, could interfere with

pending law enforcement investigations.  *See* 5 U.S.C. § 552(b)(7)(A).

7

(19)     It is known the FBI investigates terrorism threats, including those against

pipelines.  Though the FBI has confirmed investigation into prior threats against the

pipeline, it has not publicly disclosed details concerning any assessment of new threats

against the pipeline.  Doing so would tip off criminals currently seeking to do harm

against the pipeline that their activities and methods have been detected.  It would also

reveal the FBI has the capability to detect specific threats against the pipeline and is

prepared or not prepared for such threats.  It would also divulge whether the FBI has the

necessary resources to leverage against such threats.  Knowledge of these things could

result in interference with pending investigations, if such threats exist.

(20)     The FBI has not released specific information regarding any threats since

the 2017 approval of the pipeline.  If the FBI were to acknowledge responsive records,

even if withheld entirely pursuant to a FOIA exemption (b)(7)(A), such acknowledgment

would not only confirm threats have been detected, it would also disclose the scope of the

FBI's investigative capabilities and vulnerabilities.  This acknowledgment would alert the

public of the FBI's level of interest and the scope of resources available to thwart the

threat(s), and afford criminals and/or terrorists the opportunity to alter their behaviors,

thus interfering with pending enforcement proceedings.  Confirmation of the existence of

responsive records would be equivalent to the FBI acknowledging there is an active

investigation.

(21)     Conversely, if the FBI stated no responsive records existed, the

acknowledgement would reveal any current criminal and/or terrorist activities are

potentially free from FBI detection and thus tip off criminals/terrorists as to a

vulnerability of the FBI that would result in further exploitation.  These facts could be

8

extremely valuable to criminals and terrorists, who would carry out their activities with knowledge of the scope of the FBI's capabilities, vulnerabilities and awareness of the level of resources available to curtail their criminal/terrorist activities.  Thus, the FBI is asserting a (b)(7)(A) *Glomar* in response to Plaintiffs' FOIA request because acknowledging or denying the existence of records associated with detection (or lack of detection) of potential criminal/terrorist activities against the pipeline and/or related to protests, and the FBI's level of preparation and resource availability to detect and counter any attacks on the pipeline, could have a devastating impact on current criminal investigations.

### FOIA Exemption (b)(7)(E)

(22)     5 U.S.C. § 552 (b)(7)(E) provides for the withholding of:

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

(23)     Exemption (b)(7)(E) protects information that would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions that could reasonably be expected to risk circumvention of the law.  It protects techniques and procedures not well-known to the public as well as non-public details about the use of well-known techniques and procedures to protect infrastructure.

(24)     The FBI asserted a *Glomar* response because the acknowledgement or denial of records pertaining to the FBI's strategy, level of applied resources, capability

and vulnerability in detection of and thwarting threats to the pipeline, would disclose law enforcement techniques or procedures used by the FBI and could reasonably be expected to risk circumvention of the law. *See* 5 U.S.C. § 552(b)(7)(E). Each part of Plaintiffs' request presents a unique issue in choosing to confirm or deny records.

(25)    Part 1 of the Plaintiffs' request seeks legal and policy analyses and recommendations related to law enforcement funding for and staffing around oil pipeline protests. A disclosure of records, should they exist, would reveal detection of a perceived threat, strategic analysis and recommended response to such threats, thus revealing the FBI's capabilities and vulnerabilities in detection of criminal/terrorist activity and the resources available to thwart such threats.

(26)    Part 2 of the Plaintiffs' request seeks records concerning the travel of federal employees to speaking engagements, private and public meetings, panels, and conferences on the subject of preparation for oil pipeline protests and/or cooperation with private corporations. Disclosure of the FBI's role amongst these entities and locations, should such information exist, would reveal the FBI's capabilities, vulnerabilities, and the level of resources available to the FBI in specific locations. Further, disclosure of such records would divulge the level of focus, priority, and success of the FBI in obtaining the cooperation of others to detect and thwart criminal activities against pipelines.

(27)    Part 3 seeks meeting agendas, pamphlets, and other distributed matter at speaking engagements, private and public meetings, panels, and conferences where federal employees are present to discuss preparation for oil pipeline protests and/or cooperation with private corporations. Disclosure of these documents, should they exist, would reveal strategic objectives and analysis of threats, methods for combating threats,

potential needs or shortfalls of the FBI, and current capabilities and/or vulnerabilities.

(28)    Part 4 of the Plaintiffs' request seeks communications between federal employees and state or local law enforcement entities or employees thereof, and between federal employees and private security companies or employees thereof, discussing cooperation in preparation for oil pipeline protests. Disclosure of this information, if it existed, would essentially reveal the FBI's "playbook" or strategy to detect and combat threats against the pipeline. Such disclosure would provide criminals with valuable information on the FBI's plans, resources, and its very ability to combat criminal acts against the pipeline, affording criminals and terrorists the opportunity to develop countermeasures to avoid detection and circumvent the law. Acknowledgment could render the investigative techniques and the FBI's strategy ineffective.

(29)    Overall, any disclosure confirming or denying the existence of responsive records to parts 1 through 4 of the request would reveal whether detection of criminal/terrorist activity has occurred, whether plans or capabilities to thwart those activities exist, if cooperation and assistance is available to the FBI in a particular location, and whether a strategy has been developed. The likelihood of success or failure of a criminal act can be analyzed by a hostile analyst with knowledge of the amount of resources available to or applied by the FBI in any particular location. It is tantamount to publicly acknowledging the FBI's investigative strategy, capabilities, and vulnerabilities and divulges the scope of the FBI's ability to assess current threats. Criminals and terrorists could take this information and alter their patterns of activity, geographic areas of operation, contacts, and other behaviors in effort to circumvent FBI detection; therefore, rendering any investigative techniques and strategies developed by the FBI to

11

counter any such threats ineffective.

(30)    Confirming the involvement of specific private partners by acknowledging the existence of responsive records would undermine the private security partners' confidence in sharing their closely held and often proprietary information and undermine the spirit of cooperation necessary to counter any threats to the pipeline, should they exist.  If criminals and terrorists combined the details that would potentially be available in response to the four parts of Plaintiffs' request in mosaic fashion, it is conceivable they could gain an understanding of the FBI's "playbook" and predict and circumvent the FBI's attempts to enforce the law rendering the investigative techniques employed virtually useless.  Disclosure of these records, should they exist, would compromise a crucial means of collecting criminal intelligence information and severely hamper the FBI's law enforcement efforts to detect and apprehend individuals who seek to violate United States criminal and national security laws.

### CONCLUSION

(31)    Plaintiffs' FOIA request seeks records in connection with the FBI's strategic playbook for detecting and countering terrorist threats for anticipated events. Should such threats exist, merely acknowledging the existence or non-existence of records would require the FBI to confirm or deny the scope and level of detection and effectiveness of its strategies, triggering harm intended to be prevented by the application of FOIA Exemptions (b)(7)(A) and (b)(7)(E).  Confirming the existence of responsive records could trigger harm intended to be prevented by (b)(7)(A) because it could interfere with any pending law enforcement investigations into recent or current threats to the pipeline.  Additionally, acknowledging the existence of responsive records would

12

disclose law enforcement techniques used by the FBI in criminal and national security investigations, and disclosure could reasonably be expected to risk circumvention of the law. Therefore, the FBI asserts a *Glomar* response pursuant to FOIA Exemptions (b)(7)(A) and (b)(7)(E) to protect against the harms posed by confirming or denying the existence of responsive records. The FBI's *Glomar* position protects against harms posed to pending criminal and national security investigations as well as safeguards the utility of important and sensitive investigative techniques.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and Exhibits A through E attached hereto are true and correct copies.

Executed this ___ day of April, 2019.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia