**VICTORIA L. FRANCIS**
**MARK STEGER SMITH**
**Assistant U.S. Attorneys**
**U.S. Attorney's Office**
**2601 2nd Ave. North, Suite 3200**
**Billings, MT 59101**
**Phone: (406) 247-4633 – Victoria**
**          (406) 247-4667 – Mark**
**Fax: (406) 657-6058**
**Email**: **victoria.francis@usdoj.gov**
**          mark.smith3@usdoj.gov**

**ATTORNEYS FOR DEFENDANTS/**
**UNITED STATES OF AMERICA**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MONTANA
### MISSOULA DIVISION

| | |
|---|---|
| **AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, and AMERICAN CIVIL LIBERTIES UNION OF MONTANA FOUNDATION, INC.,**<br><br>        **Plaintiffs,**<br><br>    **vs.**<br><br>**DEPARTMENT OF DEFENSE, DEPARTMENT OF HOMELAND SECURITY, DEPARTMENT OF THE INTERIOR, and DEPARTMENT OF JUSTICE,**<br><br><br>        **Defendants.** | **CV 18-154-M-DWM**<br><br>**DEFENDANTS' COMBINED RESPONSE AND REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

ARGUMENT .................................................................................... 1

I.   ACE & BLM conducted adequate searches. ................................... 1

  A. ACE.................................................................................... 1

    1.  ACE's search conformed to agency organizational structure. .............. 1

    2.  BLM-held documents do not require expansion of search. .................. 2

    3.  The attachment was not omitted. ............................................ 4

    4.  ACE documents do not suggest additional undisclosed information ..... 4

    5.  ACE law enforcement official has no civilian role. ............................ 6

  B. BLM .................................................................................... 7

    1.  Emails from other locations do not indicate deficient search. .............. 7

    2.  Sklar's email did not warrant expanded search. ..................................... 9

    3.  Inconsistent search terms do not signify inadequate searches. ........... 10

II.  ACE and BLM properly withheld materials under Exemptions 5
     and 7(A) ............................................................................... 11

  A. ACE and BLM have properly withheld documents under Exemption 5. . 12

    1.  BLM justified withholding an internal email under the attorney-client
        privilege. ............................................................................. 12

    2.  BLM and ACE justified withholding emails and documents
        pursuant to the deliberative process privilege. ................................... 12

    a. USA_ACE_000008-12 ........................................................ 15

    b. USA_ACE_000065-66 ........................................................ 17

    c. USA_BLM_00043 ............................................................... 18

  B. ACE has properly withheld materials under Exemption 7(A). ................ 20

III.  FBI Glomar should be upheld. .................................................... 22

  A. Other agencies' disclosures do not undermine the FBI's *Glomar*. ........... 28

CONCLUSION ..................................................................................................30

CERTIFICATE OF COMPLIANCE .................................................................31

EXHIBITS:

Exhibit 1 – Keystone XL Pipeline Meeting Agenda

Exhibit 2 – ACE Operation Order 2014-32 (Integrated Protection)

# TABLE OF AUTHORITIES

## Cases

*Access Reports v. DOJ,*
    926 F.2d 1192 (D.C. Cir. 1991) ........................................................................17

*ACLU v. USCIS,*
    133 F.Supp.3d 234 (D.D.C. 2015) ....................................................................21

*Adair v. Mine Safety and Health Admin.,*
    No. 08-1573 (EGS), 2009 WL 9070947 (D.D.C. Sept. 23, 2009) ....................22

*Anguiano v. United States Immigration & Customs,*
    *Enf't*, 356 F.Supp.3d 917 (N.D. Cal. 2018) ......................................................11

*Bigwood v. United States Dep't of,*
    *Def.*, 132 F.Supp.3d 124 (D.D.C. 2015) ............................................................10

*Brennan Ctr. for Justice at New York Univ. Sch. of Law v. DHS,*
    331 F.Supp.3d 74 (S.D.N.Y. 2018) ...................................................................19

*BuzzFeed, Inc. v. DOJ,*
    344 F. Supp. 3d 396 (D.D.C. 2018) ..................................................................29

*Campbell v. DOJ,*
    164 F.3d 20 (D.C. Cir. 1998) ........................................................................4, 5

*Church of Scientology of Cal. v. U.S. Dep't of Army,*
    611 F.2d 738 (9th Cir. 1979) ............................................................................20

*CREWv. DHS,*
    514 F.Supp.2d 36 (D.D.C. 2007) ..................................................... 14, 16, 18, 19

*Ctr. For Nat's Sec. Studies v. INS,*
    No. 87-2068, 1990 WL 236133 (D.D.C. Dec. 19, 1990) ..................................25

*Cudzich v. INS.*,
   886 F.Supp. 101 (D.D.C. 1995) ............................................................22

*DiBacco v. U.S. Army*,
   795 F.3d 178 (D.C. Cir. 2015) ..........................................................5, 11

*Dow, Lohnes & Albertson v. Presidential Comm'n*,
   624 F.Supp. 572 (D.D.C. 1984) ........................................ 15, 17, 18, 19

*Evans v. Atwood*,
   177 F.R.D. 1 (D.D.C. 1997) .................................................................13

*Fed. Open Market Comm. v. Merrill*,
   443 U.S. 340 (1979) ............................................................................12

*Fine v. U.S. Dep't of Energy*,
   823 F.Supp. 888 (D.N.M. 1993) .........................................................20

*Fischer v. DOJ*,
   596 F.Supp.2d 34 (D.D.C. 2009) ........................................................16

*Florez v. CIA*,
   829 F.3d 178 (2d Cir. 2016) ........................................................ 26, 29

*Freedom of the Press Found. v. DOJ*,
   241 F.Supp.3d 986 (N.D. Cal. 2017) ..................................................28

*Frugone v. C.I.A.*,
   169 F.3d 772 (D.C. Cir. 1999) .................................................... 29, 30

*Hronek v. DEA.*,
   16 F.Supp.2d 1260, 1268 (D. Or. 1998) ..................................... 29, 30

*Jefferson v. DOJ*,
   168 F. App'x 448 (D.C. Cir. 2005).....................................................1, 2

*Judicial Watch, Inc. v. CFPB*,
   60 F. Supp. 3d 1 (D.D.C. 2014).............................................................19

*Judicial Watch, Inc. v. Dep't of Energy*,
   310 F.Supp.2d 271 (D.D.C. 2004).........................................................3

*Judicial Watch, Inc. v. DHS*,
   736 F.Supp.2d 202 (D.D.C. 2010)............................... 16, 17, 18, 19, 20

*Judicial Watch, Inc. v. DOJ*,
   20 F.Supp.3d 260 (D.D.C. 2014).................................................. 19, 20

*Judicial Watch, Inc. v. DOJ*,
   306 F.Supp.2d 58 (D.D.C. 2004)...........................................................14

*Judicial Watch, Inc. v. DOJ*,
   800 F.Supp.2d 202 (D.D.C. 2011)................................................. 14, 16

*Judicial Watch, Inc. v. U.S. Dep't of Treasury*,
   802 F. Supp. 2d 185 (D.D.C. 2011).....................................................18

*Lane v. DOI*,
   523 F.3d 1128 (9th Cir. 2008) .............................................................16

*Leopold v. DOJ*,
   301 F.Supp.3d 13 (D.D.C. 2018)......................................................1, 9

*Lewis v. IRS*,
   823 F.2d 375 (9th Cir. 1987) ...............................................................20

*Long v. Office of Pers. Mgmt.*,
   692 F.3d 185 (2d Cir. 2012).................................................................10

*Maricopa Audobon Soc. v. USFS.*,
   108 F.3d 1089 (9th Cir. 1997) ...........................................................17

*Mead Data Cent., Inc. v. U.S. Air Force*,
   566 F.2d 242 (D.C. Cir. 1977) ...........................................................12

*Mezerhane de Schnapp v. USCIS*,
   67 F.Supp.3d 95 (D.D.C. 2014) ........................................................21

*Minier v. CIA*,
   88 F.3d 796 (9th Cir. 1996) ...............................................................23

*Moore v. C.I.A.*,
   666 F.3d 1330 (D.C. Cir. 2011) ........................................................29

*Nat'l Wildlife Fed'n v. USFS*,
   861 F.2d 1114 (9th Cir. 1988) ...........................................................14

*Oglesby v. U.S. Dep't of Army*,
   920 F.2d 57 (D.C.Cir.1990) ........................................................ 1, 2, 3

*Petroleum Info. Corp. v. DOI*,
   976 F.2d 1429 (D.C. Cir. 1992) .........................................................14

   16 F.Supp.2d 1260 (D. Or. 1998) ........................................................2

*Poulsen v. DOD*,
   2019 WL 1318380 ................................................................. 23, 28, 29

*Pub. Employees for Env't Responsibility v. U.S. Section, Int'l Boundary & Water*
   *Comm'n (PEER)*, 740 F.3d 195 (D.C.Cir.2014).......................... 22, 25

*Rugiero v. DOJ*,
   257 F.3d 534 (6th Cir. 2005) .............................................................21

*SafeCard Servs., Inc. v. S.E.C.*,
   926 F.2d 1197 (D.C. Cir. 1991) .........................................................10

*Sensor Sys. Support, Inc. v. FAA*,
    851 F.Supp.2d 321 (D.N.H. 2012)................................................................ 17, 18

*Story of Stuff Project v. USFS*,
    345 F.Supp.3d 79 (D.D.C. 2018) ..........................................................13

*Tax Analysts v. I.R.S.*,
    117 F.3d 607 (D.C. Cir. 1997) ...............................................................13

*United States v. Dreyer*,
    804 F.3d 1266 (9th Cir. 2015) ....................................................... 6, 7, 8

*Washington v. Nat'l Archives & Records Admin.,*
    *(CREW)*, 583 F. Supp. 2d 146 (D.D.C. 2008) ...................................14

## Statutes

5 U.S.C. § 552(b)(5)...........................................................................12
5 U.S.C. § 552(b)(7)...........................................................................22
5 U.S.C. § 552(b)(7)(A)......................................................................20
18 U.S.C. § 1385..................................................................................6
33 U.S.C. § 407..................................................................................21
33 U.S.C. §§ 1319..............................................................................21
50 U.S.C. § 797..................................................................................21

## Regulations

28 C.F.R. § 0.85 .................................................................................23

## ARGUMENT

### I.  ACE & BLM conducted adequate searches.

BLM and ACE conducted reasonable searches for records responsive to Plaintiffs' request.  Agencies need only show they made "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested."  *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C.Cir.1990).  Agencies "are not required to ... perform searches which are not compatible with their own document retrieval systems."  *Leopold v. DOJ*, 301 F.Supp.3d 13, 23 (D.D.C. 2018).

BLM's and ACE's searches met these criteria.

### A.  ACE

#### 1.  ACE's search conformed to agency organizational structure.

Plaintiffs complain ACE's search was inadequate because it was directed only at ACE headquarters and "not to regional offices where responsive records would more likely be."  Doc. 46 ("Br.") at 12, citing *Jefferson v. DOJ*, 168 F. App'x 448, 450 (D.C. Cir. 2005).  But it is not invariably true that records are always more likely to be found in regional offices than in headquarters, and *Jefferson* does not support such a proposition.

*Jefferson* holds that "the agency cannot limit its search to only one record system if there are others that are likely to turn up the information requested." *Id*..

There, DOJ's Office of Inspector General searched its "investigative" database. *Id*.

When government counsel admitted a separate database ("audit and inspection")

could contain responsive records, the court held "The Government has offered no

plausible justification for limiting its search for responsive records to its

investigative database." *Id*.

Here, unlike *Jefferson*, nobody has admitted responsive records were more

likely to be found in regional offices. To the contrary, the Second Bartlett

Declaration establishes that *any responsive information* received by ACE

(headquarters or regional offices) would have been routed through the records

custodians for Insider Threat Operations (Paravechia) or Civil Works (Kopecky).

Doc. 36 at 2-3. Thus, ACE's search was not confined to a particular location, and

Plaintiffs' reliance on *Jefferson* and *Hronek v. DEA*, 16 F.Supp.2d 1260, 1268 (D.

Or. 1998) is misplaced. ACE's records search was "a good faith effort" to search

for ACLU's requested records, "using methods which can be reasonably expected

to produce the information requested." *Oglesby*, 920 F.2d at 68.

## 2.    BLM-held documents do not require expansion of search.

Plaintiffs next contend ACE's search was inadequate because other

agencies' productions provided notice the search failed to recover responsive

records – i.e., four ACE documents generated by BLM's search. Br. 14-15.

Plaintiffs complain ACE failed its search obligatiosn because the agency did not

"adjust on the fly" by expanding its search "after discovering the four documents in BLM's possession. *Id*..  Plaintiffs are wrong.

A "search is not unreasonable simply because it fails to produce all relevant material...." *Judicial Watch, Inc. v. Dep't of Energy*, 310 F.Supp.2d 271, 307 (D.D.C. 2004).  The fact BLM possessed documents created by ACE does not mean ACE's search was unreasonable, because those documents are non-responsive.  Doc. 30 ¶9.  ACLU's request sought information regarding security, potential protests, and interagency coordination regarding such protests. *Id*.  The ACE documents in BLM's possession pertained to communication about environmental permitting, not security. *Id*.; USA_ACE_000056-68.

Moreover, contrary to Plaintiffs' thesis (that a reasonable search must include regional offices), the documents invariably involved ACE headquarters. The emails originate from ACE headquarters personnel (e.g., Catalina Carrasco [USA_ACE_000063, 65]), were sent to headquarters personnel (e.g., Caleb Bowers, Eugene Pawlik [USA_ACE_00067]), and describe meetings involving headquarters personnel (Catalina Carrasco and Kamil Sztalkoper [USA_ACE_00063]).  The draft Communication Plan was reviewed and finalized by ACE headquarters before being sent to any other agencies.  USA_ACE_00065.

An agency "has discretion to conduct a standard search in response to a general request, but it must revise its assessment of what is 'reasonable' in a

particular case to account for leads that emerge during its inquiry." *Campbell*, 164

F.3d at 28.  Here, the leads that emerged from BLM indicated only that additional

non-responsive records existed at ACE headquarters, not that additional responsive

records would be found in regional offices.  Accordingly, ACE was not required to

expand its search.

### 3.    The attachment was not omitted.

Plaintiffs argue a May 15, 2018 email from ACE regarding an "upcoming

Keystone meeting" omitted a referenced attachment.  Doc. 30 at 15, citing

USA_ACE_00018.  But nothing suggests the referenced meeting pertained to

protests or security or that the attachment would be "responsive."  Moreover, the

agenda was released. *See* Doc. 21-1 at 1.  The memo referencing the agenda occurs

later in ACE's production (USA_ACE_000049) with an active hyperlink.

Plaintiffs simply needed to click on the attachment to pull up the agenda.[1]

### 4.    ACE documents do not suggest additional undisclosed information.

Plaintiffs say ACE's search was inadequate because an ACE official

identified himself in a June 1, 2017 email as the point of contact for interagency

coordination regarding "security for Keystone pipeline." *Id*. at 15-16, citing

USA_ACE_00019.  Plaintiffs are apparently incredulous there are "no additional

---

[1] The agenda is also attached to this brief as Exhibit 1, for ease of reference.

documents related to the exchange." *Id*.  First, Plaintiffs lack any basis to assert

ACE's other produced documents are unrelated to this exchange.  Even a quick

scan reveals discussion between the same parties on the same topic just a week

later.  USA_ACE_000021.

Second, the ACE official participating in these communications is the

"Chief, Operational Protection Division," i.e., the same official who unequivocally

stated that ACE produced "all information" responsive to ACLU's request. He

knew neither he nor the Insider Threat Operations staff were involved in anything

that would produce responsive documents, and that the staff had received no

information concerning security planning or protests save for what appeared in Ms.

Bartlett's declaration.

Doc. 36 at 2-3.  Plaintiffs' assertion that there must be additional documents is thus

speculation, contradicted by the evidence in hand, and is "insufficient to raise a

material question of fact with respect to the adequacy of the agency's search."

*DiBacco v. U.S. Army*, 795 F.3d 178, 190 (D.C. Cir. 2015).

Paravechia and Kopecky also advised the interagency team meetings "never

came to fruition." *Id*. at 5.  Plaintiffs dispute this point, arguing that an ACE

official "signed the sign-in sheet" for a February 16, 2017 "Pipeline Planning

Meeting" in Miles City.  Br. 18, citing USA_BLM_00167.  But athe February

2017 meeting obviously did not involve the "interagency team" discussed by BLM

(Ryan Sklar) and ACE (Paravechia): The interagency team was "still in the formative stages" four months later, on June 8, 2017.  See USA_ACE_000020.  Indeed, the group that attended the February 16 meeting "was tasked to put together some working groups moving forward," including a new "law enforcement" group.  USA_BLM_00145, 146.  Thus, the records confirm ACE's assertion that it was never involved in any interagency law enforcement meetings.

### 5.   ACE law enforcement official has no civilian role.

Plaintiffs complain ACE is disingenuous when it asserts that it lacks any law enforcement role in civilian contexts.  Br. 18.  But while an ACE "Law Enforcement Chief" did come on board on July 1, 2017 (USA_ACE_00021), this person does not serve in a law enforcement capacity as contemplated by ACLU's FOIA request.  "The sole USACE LE [law enforcement] function is information flow and liaison."  ACE OPORD 2014-32, Annex L (see Exhibit 2).  ACE is also subject to posse comitatus.  18 U.S.C. § 1385; *United States v. Dreyer*, 804 F.3d 1266, 1272 (9th Cir. 2015).  Military Police (who have more authority than ACE) can exercise law enforcement authority on U.S. Army property, [fn2] but otherwise cannot operate domestically.  *Id.*  Thus, the fact that ACE employs a "Law Enforcement Chief" does not contradict ACE's assertion that it does not serve in a law enforcement capacity and conducted no related legal or policy analysis.

**B.     BLM**

BLM routed ACLU's information request to BLM Montana, the component

that BLM headquarters deemed most likely have responsive records.  Doc. 31 ¶ 3-

4.  Plaintiffs complain this approach was flawed because their information request

was not limited to Montana, but was nation-wide.  Br. 19-20.  Yet Plaintiffs'

assertion that BLM's search was deficient is based on a mischaracterization of the

actual information request.  Plaintiffs did not seek records for <u>all</u> pipelines or <u>all</u>

planned pipelines: They sought records for one specific pipeline: Keystone XL.

USA_BLM_000003.  Even as regards that pipeline, Plaintiffs did not seek <u>all</u>

documents – they sought only information pertaining to "preparations for

anticipated protests."  *Id*.  Further, Plaintiffs only sought such documents created

between January 27, 2017 and June 12, 2018.  USA_BLM_000007, Doc. 31 at 4.

Thus, based on the actual FOIA request terms, BLM's search satisfied its search

obligations under FOIA.

**1.     Emails from other locations do not indicate deficient search.**

As an initial matter, the BLM Information Specialist that processed

Plaintiffs' request averred that – other than BLM's Montana office – "there were

no other locations reasonably likely to have responsive records."  Doc. 31, Sheeks

Decl. at 5.  Plaintiffs dispute this assertion because various produced records

originated outside Montana – e.g., emails from Nevada or Washington, D.C.  Br.

-7-

20-21.  But each of these emails was sent to a BLM official in Montana.  Thus, the May 15, 2017 email from Linda Thurn went from Washington D.C. to Jon Raby, Acting State Director of BLM Montana.  USA_ACE_000018.  The April 24, 2017 email from Catalina Carrasco mentions the availability of "quick response teams" from D.C., but that email was sent to Kim (Al) Nash, of BLM Montana (who is the source of the document).  USA_ACE_00063-64.

Similarly, the emails involving Jim Stobaugh from Nevada (USA_BLM_00017-1 through 17-15, 00038) were all either sent to or received by designated BLM-Montana records custodians (Donato Judice, Todd Yeager, Cecil Werven), or Acting Director Jon Raby – all of whom were located in Montana. Stobaugh is a BLM National Project Manager, but none of the documents indicate he independently developed or retained any records.  To the contrary, his sole documentary contribution (beyond emails) appears to be a draft agenda for a February 22, 2017 meeting in Billings, Montana, which he prepared "in conference with" Raby and Eastern Montana District Manager Diane Friez. USA_BLM_00017-9, 77.  Moreover, while Stobaugh is stationed in Nevada, he is actually an employee of BLM's Washington Office.  Keiosha Alexander declaration, ¶8.  Nevada BLM possesses no responsive records.  *Id*. ¶9.  Therefore, searching Montana BLM records was "a good faith effort... which can be

reasonably expected to produce" Stobaugh's output regarding Keystone XL.

*Leopold*, 301 F.Supp.3d at 23.[2]

Plaintiffs provide no basis to gainsay Sheeks' assertion that other locations are unlikely to have responsive records. Everything pertaining to Keystone XL planning was anchored in BLM's Montana office. Indeed, "the Montana office actually covers Montana, North Dakota, and South Dakota. *See, e.g.*, USA_BLM_00017-12.[3] Montana and South Dakota contain extensive BLM lands potentially impacted by the proposed pipeline, but Nebraska contains none.[4] Thus, Plaintiffs' FOIA request may have been sent to "BLM writ large" (Br. 21), but the relevant components are Montana and South Dakota.

### 2.    Sklar's email did not warrant expanded search.

Plaintiffs claim BLM's search was deficient because Ryan Sklar "initiated an interagency team," yet Sklar's email was not searched and "Sklar" was not used as a search term. Br. 22. But Sklar did not "initiate" an interagency team, he

---

[2] None of these documents are responsive to ACLU's FOIA request. They are about permitting, i.e., "processing Keystone XL Pipeline Project to a decision in response to the Presidential Memorandum Regarding Construction of the Keystone XL Pipeline." USA_BLM_00017-1.

[3] Plaintiffs make much of Al Nash's reference to "both states." Br. 21. The fact that BLM's Montana office covers three states obviates those concerns.

[4] Keystone XL FSEIS, Figure 2.1.7-1 (https://2012-keystonepipeline-xl.state.gov/documents/organization/221154.pdf).

relayed a proposal for such a team.  USA_ACE_00020.  Plaintiffs assume the

proposal was enacted, but the evidence does not support that assumption: Sklar

lacked the names of any would-be participants, lacked any formal charter or

business rules, and lacked an actual team.  *Id*.  ACE participated in no interagency

meetings because they "never came to fruition."  Doc. 36 ¶¶4-5.

BLM's search was reasonable, but to ensure no records were missed, BLM

will search its Washington Office.  *See* Alexander declaration, ¶¶ 10-11.  The

search will include the office of law enforcement, and will cover potentially

responsive records involving Sklar.  *Id*.

### 3.    Inconsistent search terms do not signify inadequate searches.

Plaintiffs argue the divergent search terms used by BLM custodians render

some of the searches inadequate.  Br. 23.  In particular, they claim any query

lacking both "Keystone" and "KXL" was too narrow.  *Id*.  But agencies need show

only their search terms are reasonable and adequate to respond to a FOIA request.

*Long v. Office of Pers. Mgmt.*, 692 F.3d 185, 190 (2d Cir. 2012).  Adequacy

requires that "the search was reasonably calculated to discover the requested

documents, not [that] it actually uncovered every document extant." *SafeCard

Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 1201 (D.C. Cir. 1991).  Agencies have

discretion to craft the search terms they believe are reasonably tailored to uncover

responsive documents .  *Bigwood v. United States Dep't of Def.*, 132 F.Supp.3d

-10-

124, 140 (D.D.C. 2015).  Indeed, where a custodian has "unique knowledge of the manner in which they keep their own files and the vocabulary they use," discrepancies in search terms are immaterial.  *Anguiano v. United States Immigration & Customs Enf't*, 356 F.Supp.3d 917, 921 (N.D. Cal. 2018).

Here, each BLM custodian "identified key search terms which would reasonably locate potentially responsive records within their own files."  Doc. 31 ¶ 6.  They looked at the information sought by the FOIA request, and formulated search terms based on "their knowledge of and experience with the underlying subject matter" and "familiarity with their personal recordkeeping mechanisms." *Id*.  In other words, BLM custodians knew well the records they were searching. Different search terms reflected each custodian's detailed knowledge of his or her particular dataset – not impermissible narrowing.

BLM's burden is to show its search efforts were reasonable and logically organized to uncover relevant documents: "it need not knock down every search design advanced by every requester," nor uncover every document extant. *DiBacco*, 795 F.3d at 191.  BLM's searches easily clear that hurdle here.

## II.    ACE and BLM properly withheld materials under Exemptions 5 and 7(A)

Plaintiffs challenge the withholding of five records by ACE and BLM under Exemption 5 (attorney-client and deliberative process privileges) or Exemption 7(A). Upon further inspection, BLM has determined one record

-11-

(USA_BLM_00057-58) is not attorney-client privileged, and has released it in unredacted form as USA_BLM_000167-68.

With regard to the remaining four records, Plaintiffs maintain ACE and BLM have failed to justify their withholdings. As explained below, however, BLM has properly withheld one record as attorney-client privileged, and ACE and BLM have sufficiently justified withholding all four records under the deliberative process privilege. Furthermore, ACE has sufficiently justified withholding one record because disclosure would impede ACE's and other agencies' law enforcement proceedings.

## A.   ACE and BLM have properly withheld documents under Exemption 5.

Exemption 5 shields from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The exemption encompasses the deliberative process, attorney-client, and attorney work product privileges. *Fed. Open Market Comm. v. Merrill*, 443 U.S. 340, 353 (1979).

### 1.   BLM justified withholding an internal email under the attorney-client privilege.

The attorney-client privilege protects "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice." *Mead Data Cent., Inc. v. U.S. Air Force*, 566

F.2d 242, 252-55 (D.C. Cir. 1977). In the governmental context, the "client" may be the agency and the attorney, an agency lawyer. *Tax Analysts v. I.R.S.*, 117 F.3d 607, 618 (D.C. Cir. 1997).

BLM redacted an email chain containing "confidential communications" between BLM and the Office of the Solicitor. USA_BLM_00017-2; doc. 31-1, at 1. BLM explains that the email was sent "for the purpose of relaying facts to counsel and seeking legal advice on agency action." Doc. 52-1 at 1. Specifically, in the email Stobaugh sets forth "what he believed to be BLM's forthcoming actions" and asks "the Solicitor's Office about the content of and agency response to the attached Presidential Memorandum." *Id.* Such emails fall within the attorney-client privilege, and, contrary to Plaintiffs' assertions, do not lose their privileged status if forwarded to another BLM employee. *Story of Stuff Project v. USFS*, 345 F.Supp.3d 79, 96 (D.D.C. 2018); *Evans v. Atwood*, 177 F.R.D. 1, 6 (D.D.C. 1997). Accordingly, this email was properly withheld under Exemption 5.

### 2. BLM and ACE justified withholding emails and documents pursuant to the deliberative process privilege.

The deliberative process privilege "protects the decisionmaking processes of government agencies' and 'encourages the frank discussion of legal and policy issues' by ensuring that agencies are not 'forced to operate in a fishbowl.'"

*Judicial Watch, Inc. v. DOJ*, 306 F.Supp.2d 58, 69 (D.D.C. 2004); *Petroleum Info. Corp. v. DOI*, 976 F.2d 1429, 1433-34 (D.C. Cir. 1992).

To qualify for deliberative process protection, records must be predecisional and deliberative. *Nat'l Wildlife Fed'n v. USFS*, 861 F.2d 1114, 1117 (9th Cir. 1988). "A document is predecisional if it was 'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made." *Petroleum Info. Corp.*, 976 F.2d at 1434;*Citizens For Responsibility & Ethics in Washington v. Nat'l Archives & Records Admin. (CREW)*, 583 F. Supp. 2d 146, 157 (D.D.C. 2008).

Materials are deliberative if they "bear on the formulation or exercise of agency policy-oriented judgment." *Petroleum Info.*, 976 F.2d at 1435. They can "make recommendations or express[ing] opinions on legal or policy matters," but can also be "factual summaries that were written to assist [in] the making of a discretionary decision." *CREW*, 583 F. Supp. 2d at 157. "The key question [. . .] is whether disclosure of the information would discourage candid discussion within the agency." *Judicial Watch, Inc. v. DOJ*, 800 F.Supp.2d 202, 218 (D.D.C. 2011).

Plaintiffs specifically oppose the withholding of two ACE documents (USA_ACE_000008-12; USA_ACE_000065-66) and one BLM document (USA_BLM_00043) pursuant to the deliberative process privilege.  But, as

described below, these documents were part of the agencies' deliberative processes concerning media and public engagement and security.

### a.   USA_ACE_000008-12

The first ACE document is an email and attachment between the ACE's Chief of the Operational Protection division and an Intelligence Specialist with the District of Montana's US Attorney's Office. Doc. 30, ¶10. Both records "contain information and discussions concerning potential protest activity and protestor targeting of USACE leadership." Doc. 30, ¶10. ACE's Vaughn Index explains the email "reflects interagency precoordination efforts concerning potential security threats including protests and possible sabotage concerns" and was "exchanged between government agencies to inform future decisions related to security." Doc. 30-1, at 2.

As an initial matter, these materials fall outside the time period of Plaintiffs' FOIA request, and therefore are not responsive.  Doc. 30-1, at 3. Regardless, Ms. Bartlett's declaration makes clear they are predecisional because they were prepared to assist in reaching security decisions related to permitting or approval of the Keystone pipeline. *See, e.g.*, *Dow, Lohnes & Albertson v. Presidential Comm'n*, 624 F.Supp. 572, 574–75 (D.D.C. 1984) (documents prepared to advise on the implementation of a decision, rather than its formulation, were pre-decisional). They are also deliberative because they provide information to inform

-15-

the ongoing decision-making process surrounding pipeline security. *See, e.g.,*
*CREW v. DHS*, 514 F.Supp.2d 36, 45 (D.D.C. 2007) (finding materials deliberative
as part of ongoing responses to hurricane); *Judicial Watch, Inc. v. DHS*, 736
F.Supp.2d 202, 208 (D.D.C. 2010) (multi-agency email exchanges with
recommendations concerning congressional and media inquiries "part of a
continuous process of agency decision making"). Requiring disclosure of such
materials would discourage candid discussions among agencies regarding pipeline
security, *Judicial Watch* , 800 F.Supp.2d at 218, and therefore they fall within the
deliberative process privilege.

Plaintiffs contend ACE has not adequately described the withheld email or
its attachment. Doc. 30, at 30. But a description of a document need only "inform
plaintiff of the nature of the information withheld and the reasons therefore and to
permit the Court to determine the applicability of each exemption claimed."
*Fischer v. DOJ*, 596 F.Supp.2d 34, 44 (D.D.C. 2009); *Lane v. DOI*, 523 F.3d 1128,
1135–36 (9th Cir. 2008). Ms. Bartlett explains that the email *and* the attachment
both contain information and discussions regarding "potential protest activity and
protestor targeting of USACE leadership," and the Vaughn Index further explains
the email supported the deliberative process on pipeline security. Doc. 30, ¶10;
doc. 30-1, at 2. These descriptions are sufficient to enable the Court to assess the
claimed exemptions.

-16-

Similarly, Plaintiffs' insistence that ACE fails to identify a specific decision to which the document is pre-decisional (Br. 30-31) ignores that certain decisions—like those concerning approval of the pipeline—can lead to connected decisions—like those related to the pipeline's security. *See, e.g.*, *Dow*, 624 F.Supp. at 574–75 *Judicial Watch*, 736 F.Supp.2d at 208; *Sensor Sys. Support, Inc. v. FAA*, 851 F.Supp.2d 321, 331 (D.N.H. 2012). Moreover, because deliberative materials can support many possible decisions, an agency need not identify a specific action in order for materials to be pre-decisional, only a specific decision-making process. *Maricopa Audobon Soc. v. USFS.*, 108 F.3d 1089, 1094 (9th Cir. 1997) (documents advising Regional Forester on response to allegations were pre-decisional and deliberative even though his ultimate decision was unknown); *Access Reports v. DOJ*, 926 F.2d 1192, 1196 (D.C. Cir. 1991). The email and attachment were provided as part of the deliberations related to pipeline security, and were therefore properly withheld under Exemption 5.

### b.   USA_ACE_000065-66

 ACE also withheld a single redacted paragraph in an interagency email "containing editorial comments expressing concern and reflecting possible course of action made during interagency discussions." Doc. 30, ¶10; doc. 30-1, at 4. Because the redacted material contains concerns and recommendations in support of the ongoing pipeline security decision-making process, it is pre-decisional and

deliberative, and therefore exempt from disclosure. *Judicial Watch*, 736 F.Supp.2d at 208; *CREW*, 514 F.Supp.2d at 45.

Again, Plaintiffs' insistence ACE must identify a "specific decision" to which the withheld material relates (Br. 33) ignores that documents can be provided as part of an ongoing series of decisions. *Dow*, 624 F.Supp. at 574–75; *Judicial Watch*, 736 F.Supp.2d at 208. Furthermore, materials can still be deliberative, even when continually developing circumstances make it difficult to determine the form the ultimate decision might take.  *CREW*, 514 F.Supp.2d at 45; *Judicial Watch*, 736 F.Supp.2d at 208.

Plaintiffs also allege that the "selective redaction of individual lines of text" suggests the redactions here are "unlawful." Br. 33. Plaintiffs provide no contextual support for this assertion, however, and overlook that editorial comments are properly withheld under Exemption 5. *See, e.g.*, *Judicial Watch, Inc. v. U.S. Dep't of Treasury*, 802 F. Supp. 2d 185, 196 (D.D.C. 2011); *Sensor Sys. Support*, 851 F.Supp.2d at 329-30. Here, the redacted material provided recommendations bearing on security decisions, and was properly withheld under Exemption 5.

### c.   USA_BLM_00043

BLM redacted a single paragraph from a draft Communication Plan, which, according to Ms. Sheeks' declaration, "reflect[ed] speculation and concerns of law

enforcement officers." Doc. 31, ¶13. The Vaughn index clarifies this material

"includes internal speculation and concerns about law enforcement and possible

impacts to communities." Doc. 31, at 2. This information was clearly pre-

decisional, as it was prepared to advise on media and security issues surrounding

BLM's right-of-way decision, which had not occurred. *See* USA_BLM_00044;

*Dow*, 624 F.Supp. at 574–75; *Judicial Watch*, 736 F.Supp.2d at 208. Additionally,

this document is clearly still preliminary, as evidenced by the filename and the

placeholder on the first page. The redacted material was also deliberative, because

it was provided to inform BLM staff's public relations and security decisions.

USA_BLM_00044. Courts have repeatedly held draft documents containing

security or communications strategies fall within the ambit of the deliberative

process privilege. *Judicial Watch, Inc. v. DOJ*, 20 F.Supp.3d 260, 273 (D.D.C.

2014); *Judicial Watch, Inc. v. CFPB*, 60 F. Supp. 3d 1, 9 (D.D.C. 2014); *Brennan*

*Ctr. for Justice at New York Univ. Sch. of Law v. DHS*, 331 F.Supp.3d 74, 95

(S.D.N.Y. 2018); *CREW*, 514 F.Supp.2d at 45. Accordingly, BLM properly

withheld the redacted material under Exemption 5.

Plaintiffs maintain the redacted material merely explains President Trump's

decision to "authorize the Keystone XL pipeline," and that the deliberative process

privilege does not protect deliberations "concerning how to present government

policies to the public." Br. 37, 39. Plaintiffs are incorrect, however, that

deliberations on public or media relations cannot be covered by the deliberative process privilege. *Judicial Watch*, 20 F.Supp.3d at 273; *Judicial Watch*, 736 F.Supp.2d at 208. Moreover, the redacted material, and the Communications Plan as a whole, do not attempt to explain a past decision by the President, but to explain a potential future decision to grant a right-of-way. USA_BLM_00044. Accordingly, because the redacted material contains concerns and recommendations meant to inform agency public relations and security decisions, it is shielded by Exemption 5.

### B.     ACE has properly withheld materials under Exemption 7(A).

Plaintiffs also dispute ACE's withholding of USA_ACE_000008-12 under Exemption 7(A).  This material was also properly withheld under Exemption 7(A) because disclosure would undermine ACE's and other agencies' law enforcement proceedings related to the pipeline.

Exemption 7(A) shields "records or information compiled for law enforcement purposes" if releasing them could "reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A);*Lewis v. IRS*, 823 F.2d 375, 379 (9th Cir. 1987). To avail itself of Exemption 7(A), "[a]n agency with both administrative and law enforcement functions must demonstrate that its purpose in compiling the particular document fell within its sphere of enforcement authority." *Fine v. U.S. Dep't of Energy*, 823 F.Supp. 888, 907 (D.N.M. 1993) (citing *Church*

*of Scientology of Cal. v. U.S. Dep't of Army*, 611 F.2d 738, 748 (9th Cir. 1979)).

"Law enforcement," for purposes of Exemption 7, includes enforcement of civil

and criminal laws. *Rugiero v. DOJ*, 257 F.3d 534, 550 (6th Cir. 2005).  The

purpose of the document, not the nature of the agency, determines whether it falls

under Exemption 7. *See, e.g.*, *ACLU v. USCIS*, 133 F.Supp.3d 234, 241 (D.D.C.

2015); *Mezerhane de Schnapp v. USCIS*, 67 F.Supp.3d 95, 101 (D.D.C. 2014).

While ACE does not serve in a law enforcement capacity as envisioned in

Plaintiffs' request (*see supra*), it is a "law enforcement agency" because it enforces

the Clean Water Act , 33 U.S.C. §§ 1319, 1344, and the Rivers and Harbors Act,

33 U.S.C. § 407.  It likewise possesses authority to protect its personnel and

property, as noted above. *See* 50 U.S.C. § 797; Department of Defense Instruction

(DoDI) 5200.08; Dep't of the Army Engineering Regulation No. 190-1-53.

The withheld email and its attachment were compiled pursuant to ACE's

authority to maintain the security of its personnel and property. Doc. 30, ¶12. They

were also compiled in support of the U.S. Attorney's Office's efforts to coordinate

investigations of potential security threats. Doc. 30-1, at 2. The release of such

information would undermine ACE's law enforcement proceedings by revealing its

monitoring tactics and coordination with other agencies; identifying vulnerable

infrastructure; and exposing leadership to intimidation. Doc. 30, ¶12; doc. 30-1, at

2. It would similarly undermine other federal agencies' "ability to anticipate,

-21-

prevent and respond to certain criminal threats." Doc. 30, ¶12. Accordingly, the record were properly withheld under Exemption 7(A).

Plaintiffs' suggestion that ACE admitted it did not serve in a "law enforcement capacity" takes Bartlett's comments out of context, and, in any event, is incorrect. Br. 31-32. Additionally, Plaintiffs' assertion that ACE has not identified a connection between the documents and an enforcement proceeding (Br. 32) ignores the email arose in connection with the investigation of possible threats to ACE personnel and property, and that disclosure would interfere with other agencies' investigative efforts. *See, e.g.*, *Adair v. Mine Safety and Health Admin.*, No. 08-1573 (EGS), 2009 WL 9070947, at *6-*7 (D.D.C. Sept. 23, 2009); *Cudzich v. INS.*, 886 F.Supp. 101, 107 (D.D.C. 1995). The documents are accordingly properly withheld.

## III.   FBI Glomar should be upheld.

Plaintiffs' FOIA request highlights its focus on law enforcement entities preparing for future law enforcement action.  This focus meets the threshold of the Exemption 7 FOIA exemptions. 5 U.S.C. § 552(b)(7); *Pub. Employees for Env't Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n (PEER)*, 740 F.3d 195, 202-03 (D.C.Cir. 2014).

Plaintiff's request states in the opening paragraph that it seeks "records pertaining to cooperation between federal, state, and local law enforcement entities and between federal law enforcement entities and private security companies

around <u>preparations for anticipated protests against the Keystone XL pipeline</u>."

(Doc. 32-1, p. 2) (emphasis added). Because the FBI is a law enforcement agency,

28 C.F.R. § 0.85 (a) and (d);Executive Order 12333 (Dec. 4, 1981), Plaintiffs'

request seeks information concerning law enforcement funding, staffing,

communications, and preparations for future pipeline protests.  It specifically seeks

the FBI's plans, methods, focus, resources, or lack thereof, regarding pipeline

protests.  (Doc. 32-1, p. 6).[5] Hardy's detailed Glomar affidavit (Doc. 32), meets the

requirement set forth in *Minier v. CIA*, 88 F.3d 796, 800 (9th Cir. 1996). The

*Glomar* response is proper here because confirming or denying the existence of

records would itself cause harm under Exemptions 7(A) and (E). *See Poulsen v.*

*DOD*, 2019 WL 1318380 *11.

---

[5] Plaintiff seems to infer that law enforcement planning is to thwart free speech.  However, legitimate law enforcement concerns can undergird investigations of crimes that may utilize the cover of protests to be committed. Plaintiff cites The Guardian in its FOIA request and brief.  An October 17, 2017 Guardian article  states that "Russian trolls posing as Americans made payments to genuine activists in the US to help fund protest movements on socially divisive issues."  (https://www.thguardianc.om/world/2017/0ct/17/russian-troll-factory-activists-protests-us-e).  "Perhaps the most alarming element of the article [referencing the Russian newspaper RBC] was the claim that employees of the troll factory had contacted about 100 real US-based activists to help with the organization of protests and events.  RBC claimed the activists were contacted by Facebook group administrators hiding their Russian origin and were offered financial help to pay for transport or printing costs." *Id.*

Exemption 7(A) authorizes the withholding of "records or information

compiled for law enforcement purposes [that] could reasonably be expected to

interfere with enforcement proceedings." § 552(b)(7)(A).  As Hardy explains,

acknowledging the existence of records would interfere with pending law

enforcement investigations by tipping off criminals that certain activities, and

perhaps not others, have been detected; and would allow criminals/terrorists to take

countermeasures.  (Doc. 32, ¶ 12)  Hardy details the harm as follows:

> (19)  It is known the FBI investigates terrorism threats, including those
> against pipelines.  Though the FBI has confirmed investigation into prior
> threats against the pipeline, it has not publicly disclosed details concerning
> any assessment of new threats against the pipeline.  Doing so would tip off
> criminals currently seeking to do harm against the pipeline that their
> activities and methods have been detected.  It would also reveal the FBI has
> the capability to detect specific threats against the pipeline and is prepared or
> not prepared for such threats. It would also divulge whether the FBI has the
> necessary resources to leverage against such threats.  Knowledge of these
> things could result in interference with pending investigations, if such threats
> exist.

> (20)  The FBI has not released specific information regarding any threats
> since the 2017 approval of the pipeline. If the FBI were to acknowledge
> responsive records, even if withheld entirely pursuant to a FOIA exemption
> (b)(7)(A), such acknowledgment would not only confirm threats have been
> detected, it would also disclose the scope of the FBI's investigative
> capabilities and vulnerabilities.  This acknowledgement would alert the
> public of the FBI's level of interest and the scope of resources available to
> thwart the threat(s), and afford criminals and/or terrorists the opportunity to
> alter their behaviors, thus interfering with pending enforcement proceedings.
> Confirmation of the existence of responsive records would be equivalent to
> the FBI acknowledging there is an active investigation.

-24-

(21) Conversely, if the FBI stated <u>no responsive records</u> existed, the acknowledgement would <u>reveal any current criminal and/or terrorist activities are potentially free from FBI detection</u> and thus tip off criminals/terrorists as to a vulnerability of the FBI that would result in further exploitation.  These facts could be extremely valuable to criminals and terrorists, who would carry out their activities with knowledge of the scope of the FBI's capabilities, vulnerabilities and awareness of the level of resources available to curtail their criminal/terrorist activities. . . .

(Doc. 32, ¶¶ 19-20) (emphasis added).

FBI also asserted exemption 7(E) in support of its *Glomar* response. Exemption 7(E) protects information that would disclose techniques and procedures for law enforcement investigations.  Planning materials can be a basis for Exemption 7(E).  *See PEER*, 740 F.3d at 205 (upholding the invocation of Exemption 7(E) as to emergency action plans for two dams); *Ctr. For Nat's Sec. Studies v. INS*, No. 87-2068, 1990 WL 236133, at *5-6 (D.D.C. Dec. 19, 1990) (recognizing release of INS plans to be deployed in event of attack on U.S. could assist terrorists in circumventing border).

Hardy explains that a *Glomar* under 7(E) was proper because the acknowledgement or denial of records concerning FBI's strategy, level of applied resources, or capability and vulnerability in detection of and thwarting threats to the pipeline, would disclose the FBI's law enforcement techniques or procedures and could reasonably be expected to risk circumvention of the law.  (Doc. 32, ¶ 24).

-25-

He further explains the harm that could occur as it relates to each separate category of records requested by Plaintiff, in paragraphs 25 through 28 of the FBI declaration, (Doc. 32 ¶ ¶ 25-28); and summarized in the Federal Defendant's opening brief. Doc. 42, p. 36-37.

Plaintiff asserts the FBI *Glomar* is not logical or plausible. Br. 46.  However, Plaintiff overlooks that prior threats to the pipeline existed. Doc. 32, ¶ 19. Meetings, communications, travel, funding reveal detection and resources available, or lack thereof, of any current threats.

Plaintiff relies in large part on Second Circuit law, in particular *Florez v. CIA*, 829 F.3d 178 (2d Cir. 2016), to support its *Glomar* arguments.  Br.  45-47. But the Ninth Circuit has not adopted the Second Circuit law.  While it is clear that the FBI must provide a detailed affidavit showing the harm supporting its *Glomar* and the claimed exemptions, the Ninth Circuit has not similarly required an affidavit be "particularly persuasive."

Plaintiff also asserts it did not ask for pipeline information about a specific pipeline Br. 46, yet its entire opening to its FOIA request is about the Keystone XL Pipeline.  More importantly, asking for the same information about all pipelines across the country would result in the same harms triggering Exemptions 7(A) and

-26-

(E).  In fact it would just highlight the pipelines upon which the FBI is focusing its resources.

Plaintiff also asserts it did not seek information about "specific threats." Br. 47.  But the broad general categories of information they request about funding, meetings, and cooperation are intertwined with the FBI law enforcement/terrorism investigatory mission.  Separating the law enforcement information out of any search would result in black outs or references to withheld records, and thereby disclose the information FBI has withheld.

Similarly Plaintiff's arguments about funding not supporting a specific trigger Br. 48 for an investigation, are unpersuasive.  It is the planning and analysis that may show the trigger.  Funding and travel plans show focus, analysis, priorities, or lack thereof, regarding any particular pipeline.

As explained by Hardy in his conclusions after his category by category review:

> Overall, any disclosure confirming or denying the existence of responsive records to parts 1 through 4 of the request would reveal whether detection of criminal/terrorist activity has occurred, whether plans or capabilities to thwart those activities exist, if cooperation and assistance is available to the FBI in a particular location, and whether a strategy has been developed.  The likelihood of success or failure of a criminal act can be analyzed by a hostile analyst with knowledge of the amount of resources available to or applied by the FBI in any particular location.  It is tantamount to publicly acknowledging the FBI's investigative strategy, capabilities, and

-27-

vulnerabilities and divulges the scope of the FBI's ability to assess current threats. . . .

(Doc. 32, ¶ 29, see also ¶ 30).

Based on these harms, the FBI properly refused to confirm or deny the existence of responsive records under Exemptions 7(A) and 7(E).

## A.   Other agencies' disclosures do not undermine the FBI's *Glomar*.

If an agency officially acknowledges otherwise exempt information through prior disclosure, it waives its right to claim an exemption on that information. *Poulsen v. Dep't of Def.*, 373 F.Supp.3d 1249 (N.D. Cal. 2019). "Plaintiff bear[s] the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." *Freedom of the Press Found. v. DOJ*, 241 F.Supp.3d 986, 1003 (N.D. Cal. 2017).

Plaintiffs assert the FBI cannot meet its *Glomar* burden "because the record in this case makes clear that the FBI does, in fact, have records responsive to the Request." Br. 48. Rather than point to any public disclosures by the FBI, however, Plaintiffs cite BLM and state records that mention the FBI. *Id.* at 48. Plaintiffs insist the "government" has acknowledged the FBI possesses responsive documents, and that the FBI cannot maintain its *Glomar*. *Id.* at 51-52.

The FBI's *Glomar* response is proper because FBI has not made any public disclosures suggesting the existence/non-existence of responsive records. Plaintiff

-28-

contends that other agencies' disclosures constitute official acknowledgement or

sufficient evidence to undermine the FBI's *Glomar*, but the majority of the courts

that have addressed this issue have rejected such arguments. *See, e.g.*, *Frugone v.*

*C.I.A.*, 169 F.3d 772, 775 (D.C. Cir. 1999); *Moore v. C.I.A.*, 666 F.3d 1330, 1333

(D.C. Cir. 2011); *BuzzFeed, Inc. v. DOJ*, 344 F. Supp. 3d 396, 410 (D.D.C. 2018);

*see also Poulsen*, 373 F.Supp.3d at 1249 ( acknowledgements by executive

agencies insufficient to waive agencies' *Glomar* responses). Even the case upon

which Plaintiffs most heavily rely does not support Plaintiffs' assertions:  In

*Florez*, the Second Circuit merely concluded that FBI declarations were previously

unavailable "relevant evidence" that bore on the justifications for the CIA's

*Glomar* response. 829 F.3d at 186-87. The court expressly recognized official

acknowledgement is "limited only to official and public disclosures made by the

same agency." *Id.* at 187.

Additionally, BLM and state records Plaintiffs cite are not sufficient

evidence to undermine the FBI's *Glomar*. Many of these records are emails

copying FBI employees, without providing any indication the FBI possesses

responsive records. *See* USA_BLM_00027, 52, 55, 57, 59, 60, 62-63, 136, 138.

Others mention the FBI in connection with meetings, with minimal discussion of

the content of those meetings.  USA_BLM_90-91, 107. Most importantly, none of

the records amount to official acknowledgement by the FBI that it has responsive

records, and forcing the FBI to disclose based on disclosures by other agencies

makes no sense in light of the concerns raised in Mr. Hardy's declaration.

*Frugone*, 169 F.3d at 775. The FBI therefore properly asserted a *Glomar*.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Partial Summary Judgment

(doc. 45) should be denied.

DATED this 12th day of June, 2019.

KURT G. ALME
United States Attorney

/s/ Victoria L. Francis
Victoria L. Francis
Mark Steger Smith
Assistant U.S. Attorneys
Attorneys for Defendants

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2)(E), the attached brief is proportionately spaced, has a typeface of 14 points and contains 6,500 words, excluding the caption and certificates of service and compliance.

**DATED** this 12th day of June, 2019.

/s/ Victoria L. Francis
Victoria L. Francis
Mark Steger Smith
Assistant  U.S. Attorneys
Attorneys for Defendants