IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION



FILED

AUG 2 1 2019

Clerk, U.S District Court
District Of Montana
Missoula

AMERICAN CIVIL LIBERTIES
UNION, AMERICAN CIVIL
LIBERTIES UNION FOUNDATION,
and AMERICAN CIVIL LIBERTIES
UNION OF MONTANA
FOUNDATION, INC.,

        Plaintiffs,

vs.

DEPARTMENT OF DEFENSE,
DEPARTMENT OF HOMELAND
SECURITY, DEPARTMENT OF THE
INTERIOR, and DEPARTMENT OF
JUSTICE,

        Defendants.

CV 18–154–M–DWM

OPINION and
ORDER

The American Civil Liberties Union ("ACLU") brings this action against

various federal agencies for violations of the Freedom of Information Act

("FOIA"), 5 U.S.C. § 552, which requires agencies to disclose requested records

unless an enumerated statutory exemption applies. The ACLU submitted a FOIA

request for information about federal coordination with local law enforcement in

anticipation of protests at the Keystone XL pipeline, which is proposed to traverse

Montana, South Dakota, and Nebraska. In this suit, the ACLU alleges the agencies

failed to adequately search for records in response to its FOIA request and

1

improperly withheld responsive records that were located. It seeks, among other

things, an order requiring the agencies to disclose the requested records. (Doc. 1 at

17.) The parties have filed cross-motions for summary judgment. (Docs. 40, 45.)

The motions are each granted in part and denied in part.

## BACKGROUND

On January 23, 2018, the ACLU submitted a FOIA request to the Federal

Bureau of Investigation ("FBI"), Office of Legal Counsel, Department of

Homeland Security, Army Corps of Engineers, and Bureau of Land Management

("BLM") for records related to cooperation between federal, state, and local law

enforcement entities about preparations for anticipated protests against the

Keystone XL pipeline. (Doc. 48 at ¶¶ 1–3, 42; Doc. 54 at ¶¶ 1–2, 13.)

Specifically, the request sought all records created since January 27, 2017,

concerning

(1) Legal and policy analyses and recommendations related to law
enforcement funding for and staffing around oil pipeline protests.
Such recommendations may include, but are not limited to,
declarations of a state of emergency by state and local entities in
order to marshal additional funds, and requests by state or local
entities for federal agencies to provide funding or personnel for
counter-protest operations; and

(2) Travel of federal employees to speaking engagements, private and
public meetings, panels, and conferences on the subject of
preparation for oil pipeline protests and/or cooperation with private
corporations in furtherance thereof; and

(3) Meeting agendas, pamphlets, and other distributed matter at speaking engagements, private and public meetings, panels, and conferences where federal employees are present to discuss preparation for oil pipeline protests and/or cooperation with private corporations in furtherance thereof; and

(4) Communications between federal employees and state or local law enforcement entities or employees thereof, and between federal employees and private security companies or employees thereof, discussing cooperation in preparation for oil pipeline protests.

With respect to the Office of the Secretary of Defense, the ACLU seeks the release of all records created since January 27, 2017, concerning:

(5) Purchases, requests for purchase, and requests by state and local law enforcement officials of riot gear, including but not limited to tear gas, concussion grenades, and water cannons, from the U.S. Department of Defense's Law Enforcement Support Office, also known as the 1033 program.

(Doc. 48 at ¶¶ 5, 42; Doc. 35-1 at 6.) On April 2, 2018, the ACLU sent another substantially similar request to the FBI. (Doc. 48 at ¶ 59; Doc. 32-1.)

The ACLU initially challenged each agency's response to its FOIA request. It has since abandoned its claims against all but the Army Corps, BLM, and the FBI. (Doc. 45 at 2; Doc. 46 at 17 n.10.) Accordingly, only those agencies' responses are described below.

The Army Corps initially identified twelve pages of responsive emails. (Doc. 48 at ¶ 12; Doc. 54 at ¶ 3.) On July 17, 2018, it disclosed seven of the twelve pages. (Doc. 48 at ¶¶ 10, 12, 17; Doc. 54 at ¶ 3.) It withheld five pages under FOIA Exemptions 5, 6, and 7(A). (Doc. 48 at ¶¶ 12, 37; Doc. 54 at ¶¶ 3,

3

12.) On March 29, 2019, BLM located four responsive documents, totaling thirteen pages, that originated with the Army Corps. (Doc. 48 at ¶ 33; Doc. 54 at ¶ 8.) The Army Corps disclosed two of those documents in full and two with redactions pursuant to Exemptions 5 and 6. (Doc. 48 at ¶ 33.) In total, the Army Corps disclosed twenty pages of redacted records and withheld five pages. (Doc. 54 at ¶ 9.)

BLM identified 184 pages of responsive records. (Doc. 48 at ¶ 50; Doc. 54 at ¶ 16.) It withheld sixteen documents under Exemptions 4, 5, 6, and 7(C). (Doc. 48 at ¶¶ 52–58; Doc. 54 at ¶ 18.) However, BLM disclosed segregable factual material from the documents withheld under Exemption 5. (Doc. 48 at ¶ 57.) It is unclear how many of the 184 pages were ultimately disclosed, either in full or redacted form.

On April 6, 2018, the FBI informed the ACLU that "unusual circumstances" applied to the FOIA request, which would result in delayed processing. (Doc. 48 at ¶ 61; Doc. 54 at ¶ 21.) On January 9, 2019, the FBI provided a *Glomar* response, meaning it refused to confirm or deny the existence or nonexistence of responsive records. (Doc. 48 at ¶ 67; Doc. 54 at ¶ 23; Doc. 32-5.)

The ACLU filed this suit on September 4, 2018, alleging various FOIA violations by seven different agencies. (Doc. 1.) It has since narrowed its claims. The issues that remain are (1) whether the Army Corps failed to conduct an

4

adequate search for records in response to the ACLU's FOIA request,[1] (2) whether

the Army Corps and BLM properly invoked Exemptions 5 and 7(A) to redact and

withhold certain records, and (3) whether the FBI's *Glomar* response was proper.

Pursuant to this Court's September 10, 2018 Order, (Doc. 7), the agencies filed

*Vaughn* indices,[2] (Docs. 21-1, 30-1, 31-1, 53), identifying the documents withheld,

the FOIA exemptions claimed, and why each document falls within the claimed

exemption. *See Wiener v. FBI*, 943 F.2d 972, 977 (9th Cir. 1992). The agencies

have also filed declarations describing their searches. (Docs. 21, 30, 36 (Army

Corps); Docs. 31, 51 (BLM); Doc. 32 (FBI).) On May 1, 2019, the agencies

moved for summary judgment. (Doc. 40.) The ACLU filed a cross-motion for

summary judgment on May 22, 2019. (Doc. 45.)

## LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no

genuine issue as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). Most FOIA cases are resolved at summary

judgment because the facts are rarely in dispute. *See Animal Legal Def. Fund v.*

*Food & Drug Admin.*, 836 F.3d 987, 989 (9th Cir. 2016) (en banc) (per curiam).

---

[1] The ACLU also challenged the adequacy of BLM's search, and even briefed the
issue. (Doc. 46 at 28–33.) However, the ACLU withdrew the challenge after
BLM agreed to conduct a further search. (Doc. 56 at 7 n.2.)
[2] *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973).

FOIA "was enacted to facilitate public access to Government documents." *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991). It requires government agencies to make records "promptly available to any person" upon request. 5 U.S.C. § 552(a)(3)(A). An agency may avoid disclosure only if it proves that the requested documents fall within one of nine enumerated exemptions. *See* 5 U.S.C. § 552(b)(1)–(9); *see also Lane v. Dep't of Interior*, 523 F.3d 1128, 1137 (9th Cir. 2008). In limited circumstances, "a government agency may issue a '*Glomar* Response,' that is, refuse to confirm or deny the existence of certain records, if the FOIA exemption would itself preclude the acknowledgment of such documents." *Minier v. CIA*, 88 F.3d 796, 800 (9th Cir. 1996) (italics added). Here, the ACLU alleges (1) the Army Corps failed to conduct an adequate search for responsive records, (2) the Army Corps and BLM improperly relied on Exemptions 5 and 7(A) to withhold and redact certain records, and (3) the FBI's *Glomar* response was unjustified.

## I.    Adequacy of the Army Corps' search

Agencies responding to a FOIA request must perform "a search reasonably calculated to uncover all relevant documents." *Zemansky v. EPA*, 767 F.2d 569, 571 (9th Cir. 1985) (internal quotation marks omitted). "An agency may prove the reasonableness of its search through affidavits from responsible agency officials, as

long as such affidavits are relatively detailed, nonconclusory, and submitted in good faith." *Pollack v. U.S. Bureau of Prisons*, 879 F.2d 406, 409 (9th Cir. 1989). "[T]he issue is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*." *Hamdan v. Dep't of Justice*, 797 F.3d 759, 770–71 (9th Cir. 2015) (internal quotation marks omitted). "[T]he failure to produce or identify a few isolated documents cannot by itself prove the searches inadequate." *Id.* (internal quotation marks omitted) (alteration in original). However, "if a review of the record raises substantial doubt, particularly in view of well-defined requests and positive indications of overlooked materials, summary judgment is inappropriate." *Id.* (internal quotation marks omitted). When evaluating an agency's search, the facts are construed in the light most favorable to the requestor. *Citizens Comm'n on Human Rights v. Food & Drug Admin.*, 45 F.3d 1325, 1328 (9th Cir. 1995).

Here, the Army Corps' declarations are not detailed enough to establish the search's reasonableness. Further, the FOIA record confirms the Army Corps' search was inadequate as a matter of law.

## A. Army Corps' affidavits

The Army Corps relies on three declarations from its FOIA Officer Michelle Bartlett to establish that its search was adequate. (Docs. 21, 30, 36.) According to

Bartlett, the Army Corps began its search by having David Paravecchia,[3] the Chief of the Operational Protection Division, determine who would likely have responsive information. (Doc. 30 at ¶ 7.) Paravecchia concluded his office, which is responsible for security of the Army Corps' infrastructure, would be the primary source of responsive records. (*Id.*; Doc. 36 at ¶ 2.) As Chief, he would have received or been aware of all potential security concerns involving Army Corps infrastructure. (Doc. 36 at ¶ 2.) Accordingly, he searched his email and computer files. (*Id.*) Paravecchia also determined Steve Kopecky, the Deputy for the Civil Works Directorate, which manages the Army Corps' infrastructure, might have responsive information. (Doc. 30 at ¶ 7; Doc. 36 at ¶ 2.) Kopecky searched the Civil Works Directorate's email and meeting notes using the search terms "Keystone," "Security," "Law enforcement," and "Consultation." (Doc. 36 at ¶ 2.)

As discussed above, the Army Corps located twelve pages of responsive emails. (Doc. 48 at ¶ 12; Doc. 54 at ¶ 3.) BLM subsequently located thirteen pages of responsive documents that had originated with the Army Corps. (Doc. 48 at ¶ 33; Doc. 54 at ¶ 8.)

Bartlett's declarations are insufficient to establish the adequacy of the Army Corps' search. Her Second Supplemental Declaration, (Doc. 36), the last of the

---

[3] Bartlett's declaration variously spells this name as Paravecchia, Paravechia, and Paravvechia. (*See* Doc. 36 at ¶ 2.)

8

three she submitted, is the most detailed. Even so, it lacks the information necessary to evaluate the search. The declaration provides no information on Paravecchia's search methodology, such as the search terms he employed. Nor does it explain how Paravecchia organizes and manages the records he searched— his own emails and computer files. Paravecchia's determination that as Chief he would have access to all responsive records within his department is taken in good faith. *See Ray*, 502 U.S. at 179. But the declaration merely states that Paravecchia "searched his email and computer files and confirmed they did not contain any responsive documents beyond those produced. All documents are preserved through his email vault and/or electronic files." (Doc. 36 at ¶ 2.) Without more, whether Paravecchia searched for the relevant records in the appropriate place, even among his own files, cannot be determined.

Further, though Bartlett's declaration lists the search terms Kopecky used, (*see id.*), it does not explain how the Civil Works Directorate organizes the emails and meeting notes he searched. Nor does it describe whose email and notes he reviewed. Unlike with Paravecchia, nothing suggests Kopecky's own files would contain all the Directorate's potentially responsive records. But it is impossible to tell from the declaration whether Kopecky searched only his own files or whether he searched the entire Directorate's files. Without providing even a cursory explanation of Paravecchia's search measures, the scope of Kopecky's search, or

9

its filing and email procedures, the Army Corps cannot meet its burden to prove its search was adequate.

## B. FOIA record

Summary judgment for the ACLU on the adequacy of the search is warranted based solely on the Army Corps' insufficient declarations. But the record also makes clear the Army Corps' search was inadequate. For example, BLM identified records the Army Corps failed to locate, indicating the Army Corps' search was incomplete. (Doc. 48 at ¶ 33.) Specifically, BLM identified the Army Corps' communication plan for the Keystone XL pipeline, (Doc. 35-1 at 56–62), and three emails about the plan from Army Corps personnel, (*id.* at 63–68).

The Army Corps argues these documents were nonresponsive because they pertain to communication and environmental permitting, not security or protests. (Doc 42 at 17; Doc. 55 at 11.) This position is belied by the Army Corps' decision to disclose the documents, as well as the documents' explicit reference to potential protests. For example, under the heading "Threats," the communication plan states that "Protests may be staged on Federal lands, including Corps-managed land at Fort Peck," (Doc. 35-1 at 58), and one of the emails explains, "There's [sic] no current protests planned and most likely won't happen until there's a definite physical place where protests can happen," (*id.* at 64).

The Army Corps next argues that failing to identify some relevant material

10

does not render its search inadequate. The Army Corps is correct that the inquiry is whether the search as a whole was reasonable, not whether the search uncovered individual documents. *See Hamdan*, 797 F.3d at 771. But the issue here is not that the Army Corps missed four responsive documents; it is that those documents reveal inadequacies in the Army Corps' search. Specifically, the documents repeatedly reference Army Corps personnel in Omaha, indicating the Army Corps should have searched for responsive records in its Omaha office, rather than limiting its search to its Washington, DC headquarters. (*See* Doc. 36 at ¶ 2.) For example, the communication plan lists Captain Ryan Hignight of the Omaha District as the Army Corps' contact for the Keystone XL pipeline. (Doc. 35-1 at 56.) Further, the emails about the communication plan, dated April 24, June 12, and September 8, 2017, include Hignight and Thomas O'hara, also of the Omaha District. (*Id.* at 63, 65, 67–68.) And, as one of the emails explains, the Omaha District is responsible for all communications about the pipeline from the Army Corps. (*Id.* at 63.) Indeed, the email emphasizes "All communication needs to stay down at the local level." (*Id.* at 64.)

The Army Corps argues it has no obligation to search its field offices and that limiting its search to Washington, DC was reasonable because the communication plan and emails involved headquarters personnel. The Army Corps' obligation is to search for responsive documents, wherever they may be.

11

Here, the record's repeated references to Omaha personnel, the emphasis on Omaha personnel's involvement in communications about the pipeline, and the communication plan's explicit reference to protests, make clear an adequate search would have encompassed the Omaha field office.

But the record raises further questions about the Army Corps' search. For example, Bartlett explained the Army Corps lacked responsive records because it is barred from engaging in law enforcement activities. (Doc. 36 at ¶ 3.) However, BLM disclosures show Army Corps personnel were at least involved in communications about law enforcement and the pipeline. Specifically, the Army Corps is mentioned as participating in the initial meeting of a law enforcement subgroup. (Doc. 35-2 at 108.) Even more compelling, as discussed below, the Army Corps withheld records it claims were compiled for law enforcement purposes on the basis that securing its personnel and property is a law enforcement function. (Doc. 55 at 29.)

Finally, Bartlett claimed no Army Corps personnel traveled to local meetings about the pipeline. (Doc. 36 at ¶¶ 4–5.) But BLM disclosures show Army Corps personnel attended a February 16, 2017 initial planning meeting in Miles City, Montana, (Doc. 35-2 at 184), and a February 22, 2017 meeting, also in Montana, that included a presentation on "heightened public interest" in the Keystone XL pipeline, (*id.* at 30). And Army Corps personnel were included on an

12

August 2, 2018 email about a planned meeting involving the FBI's Pipeline
Security Initiative. (*Id.* at 83–84.) Taken alone, these inconsistencies between
Bartlett's declaration and the record might be treated as isolated instances of the
Army Corps' search failing to identify relevant information. But in the context of
Bartlett's insufficient declarations and the Army Corps' failure to search its Omaha
field office, the inconsistencies are further evidence of the search's overall
inadequacy.

## II. Exemptions 5 and 7(A)

The ACLU argues the Army Corps and BLM improperly withheld and
redacted records under Exemptions 5 and 7(A). In light of FOIA's policy favoring
disclosure, exemptions are construed narrowly. *Dep't of Air Force v. Rose*, 425
U.S. 352, 361 (1976). Further, agencies bear the burden of proving an exemption
applies. *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 973 (9th Cir. 2009). "To
justify withholding, the government must provide tailored reasons in response to a
FOIA request. It may not respond with boilerplate or conclusory statements."
*Shannahan v. IRS*, 672 F.3d 1142, 1148 (9th Cir. 2012). Here, the agencies were
required to submit *Vaughn* indices, (Docs. 21-1, 30-1, 31-1, 53-1), identifying the
documents withheld under each exemption and explaining each exemption's
applicability. *See Wiener*, 943 F.2d at 977. "The purpose of the index is to afford
the FOIA requester a meaningful opportunity to contest, and the district court an

13

adequate foundation to review, the soundness of the withholding." *Id.* (internal

quotation marks omitted). In addition to reviewing the *Vaughn* index, courts may

conduct in camera review of the withheld documents. 5 U.S.C. § 552(a)(4)(B).

"In camera inspection, however, is not a substitute for the government's burden of

proof, and should not be resorted to lightly." *Lewis v. IRS*, 823 F.2d 375, 378 (9th

Cir. 1987) (internal quotation marks omitted).

## A.    Exemption 5

Exemption 5 applies to "inter-agency or intra-agency memorandums or

letters that would not be available by law to a party other than an agency in

litigation with the agency, provided that the deliberative process privilege shall not

apply to records created 25 years or more before the date on which the records

were requested." 5 U.S.C. § 552(b)(5). It allows agencies to withhold documents

that are "normally privileged in the civil discovery context." *NLRB v. Sears,*

*Roebuck & Co.*, 421 U.S. 132, 149 (1975). It encompasses the deliberative

process, attorney work product, and attorney-client privileges. *Maricopa Audubon*

*Soc'y v. U.S. Forest Serv.* ("*Maricopa*"), 108 F.3d 1089, 1092 (9th Cir. 1997).

The threshold question is whether the records qualify as "inter-agency or

intra-agency memorandums or letters." 5 U.S.C. § 552(b)(5); *Dep't of Interior v.*

*Klamath Water Users Protective Ass'n*, 532 U.S. 1, 12 (2001). The inquiry then

turns to whether the records are subject to an applicable privilege. *See Klamath*,

14

532 U.S. at 12. Here, the Army Corps and BLM have asserted the deliberative process privilege and attorney-client privilege.

**1.    Deliberative process privilege**

The deliberative process privilege applies to documents that are both predecisional and deliberative. *Sierra Club v. U.S. Fish & Wildlife Serv.*, 925 F.3d 1000, 1011–12 (9th Cir. 2019). "A document is pre-decisional if it is prepared in order to assist an agency decision-maker in arriving at his decision . . . ." *Id.* at 1012 (internal quotation marks omitted). As the parties' briefs indicate, Ninth Circuit case law is imprecise about whether an agency must point to a particular decision to establish a document is "predecisional." *Maricopa* declared "that the agency must identify a specific decision to which the document is predecisional." 108 F.3d at 1094. Later cases have favorably cited this language, *see Sierra Club*, 925 F.3d at 1012, and the ACLU relies on those cases here, (*see* Doc. 46 at 39; Doc. 56 at 11). However, *Maricopa* ultimately held the requested material was predecisional, notwithstanding the agency's failure to identify a resulting decision. 108 F.3d at 1094. Specifically, the court stated that "[o]ur inability to identify the actual decision that was made does not alter the fact that the withheld materials were prepared in order to assist an agency decisionmaker in arriving at his decision." *Id.* (internal quotation marks omitted). The Army Corps and BLM predictably rely on this language. (*See* Doc. 55 at 25.)

15

*Maricopa*'s facts make clear the statement that agencies "must identify a specific decision" is more fairly read to mean agencies must show their intent to make a specific decision. 108 F.3d at 1094. The Forest Service Chief hired an independent consultant to investigate complaints about the management of the Forest Service's Southwestern Region. *Id.* at 1091. The Forest Service denied a FOIA request for the investigatory report under Exemption 5's deliberative process privilege, arguing the report was part of its continual self-examination and thus was predecisional. *Id.* at 1091–92, 1094. The court explicitly rejected the contention that an ongoing evaluation could yield a predecisional record. *Id.* at 1094. However, the court determined the report was *not* "merely part of a routine and ongoing process of self-evaluation" and was instead meant to advise the Chief in responding to specific complaints. *Id.* That the court could not ascertain the Chief's response did not seem to matter, despite the opinion's clear language that an agency must identify a specific decision. *See id.* Rather, the court explained the Southwestern Region's manager had taken an early retirement and surmised that was either because of the Chief's response to the complaints or obviated the need for a response. *Id.* In any event, the investigatory report was properly classified as predecisional. *Id.* Accordingly, *Maricopa* is best read to mean that a "predecisional" document must have been produced during an identifiable decisionmaking process, even if the process did not culminate in a decision.

This is consistent with other Ninth Circuit case law. For example, *Assembly of the State of California. v. U.S. Department of Commerce*, which predates *Maricopa*, explained that "reference[] to a decision that possibly may be made at some undisclosed time in the future" is insufficient to establish a document is predecisional. 968 F.2d 916, 921 (9th Cir. 1992). Further, *Lahr* cited *Maricopa* for the proposition that predecisional "documents must be prepared to assist an agency decision-maker in arriving at a future particular decision, although we need not be able to identify retroactively the actual decision that was made on the basis of the withheld documents." 569 F.3d at 981 (internal quotation marks omitted). Together, *Assembly*, *Lahr*, and *Maricopa* provide a predecisional document must be the product of a distinct decisionmaking process, as opposed to a routine or ongoing procedure, and that the process must contemplate a particular decision will be made, though the decision need not come to fruition.

In addition to being predecisional, a document must be deliberative to gain protection under Exemption 5's deliberative process privilege. *Sierra Club*, 925 F.3d at 1015. A document is deliberative if it "reveal[s] the mental processes of the decisionmakers," such that disclosure would discourage candid discussion within an agency. *Id.* (internal quotation marks omitted). Factors to consider include the roles of the author and recipient in the decisionmaking process, such as whether the document is addressed to a superior from an inferior, and whether the

17

document reflects the "personal opinions of the writer rather than the policy of the agency." *Maricopa*, 108 F.3d at 1094–95 (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)).

## 2. Attorney-client privilege

The attorney-client privilege protects confidential communications between a client and an attorney made for the purpose of obtaining or providing legal advice. *See United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002); *Coastal States*, 617 F.2d at 862–63. For the privilege to apply, the communications must have been confidential at the time they were made and kept confidential since. *Coastal States*, 617 F.2d at 863.

## B. Exemption 7(A)

Exemption 7(A) applies to "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). Whether a document falls within Exemption 7(A) is a two-step inquiry. *ACLU v. FBI*, 881 F.3d 776, 778 (9th Cir. 2018). First, the agency must show the document was "compiled for law enforcement purposes." *Id.* Second, the agency must show that disclosure would "interfere with enforcement proceedings." *Id.*; 5 U.S.C. § 552(b)(7)(A).

To show a document was compiled for law enforcement purposes, "the

agency need only establish a rational nexus between the withheld document and its authorized law enforcement activities." *ACLU*, 881 F.3d at 781. An agency that exercises both administrative and law enforcement functions must demonstrate the document was created in furtherance of its law enforcement duties. *Church of Scientology v. U.S. Dep't of Army*, 611 F.2d 738, 748 (9th Cir. 1979), *overruled on other grounds by Animal Legal Def. Fund*, 836 F.3d at 990.

To show disclosure could "interfere with enforcement proceedings," the agency must establish that law enforcement proceedings are "pending or anticipated." *Van Bourg, Allen, Weinberg & Roger v. NLRB*, 751 F.2d 982, 985 (9th Cir. 1985). However, the agency need only make a general showing that disclosure would interfere; it is "not required to make a specific factual showing with respect to each withheld document that disclosure would *actually interfere* with a particular enforcement proceeding." *Lewis*, 823 F.2d at 380 (internal quotation marks omitted).

## C. Withholdings and redactions in this case

Here, the ACLU challenges (1) the Army Corps' withholding of one email and the accompanying attachment under Exemption 5's deliberative process privilege and Exemption 7(A); (2) the Army Corps' redaction of a second email under Exemption 5's deliberative process privilege; (3) BLM's redaction of a communication plan under Exemption 5's deliberative process privilege; and

(4) BLM's redaction of an email under Exemption 5's attorney-client privilege.[4]

(Doc. 46 at 38, 41, 43, 46.)

### 1. Army Corps' withheld email and attachment (USA_ACE_000008–12)

The Army Corps withheld one email with the subject line "[EXTERNAL]

re: Keystone XL, Ft. Peck" and the accompanying attachment under both

Exemption 5's deliberative process privilege and Exemption 7(A). (Doc. 30-1 at

2.) The agency's *Vaughn* index describes the email as follows:

> Email contains a discussion between the Chief of the Operational
> Protection Division for the Directorate of Contingency Operations and
> an Intelligence Specialist with the District of Montana's US Attorney's
> Office. The email reflects interagency precoordination efforts
> concerning potential security threats including protests and possible
> sabotage concerns.

(*Id.*) Bartlett's declaration states the "email and its attachment contain information

and discussions concerning potential protest activity and protestor targeting of

[Army Corps] leadership." (Doc. 30 at ¶ 10.)

With respect to Exemption 5's deliberative process privilege, the Army

Corps' *Vaughn* index provides "[t]his information is deliberative as it is being

exchanged between goverment [sic] agencies to inform future decisions related to

security." (Doc. 30-1 at 2.) Bartlett's declaration adds only that "[t]he information

---

[4] The ACLU initially challenged BLM's assertion of attorney-client privilege over
a second email, (USA_BLM_00057–58, Doc. 35-2 at 74–75), but BLM has since
disclosed the email, (USA_BLM_00168–69, Doc. 52-1).

withheld from the interagency email consisted of a paragraph containing editorial comments expressing concern and reflecting possible course of action made during interagency discussions." (Doc. 30 at ¶ 10.)

At the threshold, the *Vaughn* index establishes the email and its attachment are "inter-agency" records subject to Exemption 5 because they were exchanged between the Army Corps and the Department of Justice. *See* 5 U.S.C. § 552(b)(5); (Doc. 30-1 at 2). However, the Army Corps has not shown the documents are "predecisional" such that the deliberative process privilege applies. The only information the Army Corps provided about its decisionmaking process is that the documents will "inform future decisions related to security." (Doc. 30-1 at 2.) This is insufficient. It leaves unclear whether the email and attachment resulted from a distinct decisionmaking process about how to secure the Keystone XL pipeline or whether they are merely part of an ongoing evaluation of pipeline or infrastructure security. *See Lahr*, 569 F.3d at 981. The record suggests the latter. Bartlett's declaration explains "Keystone XL has not yet cleared permitting, so discussions about security are premature," indicating the Army Corps has not yet initiated a decisionmaking process regarding security for the pipeline. (Doc. 36 at ¶ 6.) Accordingly, the Army Corps has not adequately justified its withholding of the email and attachment under Exemption 5.

With respect to Exemption 7(A), the Army Corps' *Vaughn* index provides

"the information, if released could interfere with law enforcement proceedings.

Knowledge of [Army Corps] monitoring tactics and coordination with other law

enforcement agencies could undermine the efficacy of those tactics." (Doc. 30-1 at

2.) Bartlett's declaration provides more detail:

> Release of this type of material may degrade federal agencies' ability to anticipate, prevent, and respond to certain criminal threats to oil pipelines. Specifically, the material reveals areas of infrastructure that are of greater concern because of their unique vulnerability to sabotage. Additionally, release of the information, which includes contact information of law enforcement personnel could lead to harassment and attacks targeting [Army Corps] leadership as occurred in response to [the Dakota Access Pipeline] and which is detailed in the withheld information. Such harassment may be used as a tool to intimidate those responsible for the regulatory decisions concerning the Keystone pipeline in the future and those charged with federal security and threat response.

(Doc. 30 at ¶ 12.)

The statements in the *Vaughn* index and Bartlett's declaration establish that

the documents were "compiled for law enforcement purposes." 5 U.S.C.

§ 552(b)(7). The Army Corps is authorized to "take reasonably necessary and

lawful measures to maintain law and order and protect personnel and property."

Dep't of the Army Engineering Reg. 190-1-53 § 6-1; *see also* 50 U.S.C. § 797.

Communications about potential threats to Army Corps infrastructure, like the

email and attachment, are rationally connected to the Army Corps' authority to

secure its property, which is all that is required to be "compiled for law

enforcement purposes." *See ACLU*, 881 F.3d at 781.

22

However, the Army Corps has not established that release of the email and attachment will "interfere with enforcement proceedings." The Army Corps argues disclosure will "undermine the efficacy" of its security tactics, (Doc. 30-1 at 2), and "degrade federal agencies' ability to anticipate, prevent, and respond to certain criminal threats to oil pipelines," (Doc. 30 at ¶ 12). But the purpose of Exemption 7(A) is "to prevent harm to the Government's case in court." *Shannahan*, 672 F.3d at 1150 (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224 (1978)). Accordingly, Exemption 7(A) concerns pending or contemplated *proceedings*, not general law enforcement functions. *See id.*; *see also Lewis*, 823 F.2d at 380 (applying Exemption 7(A) to an ongoing criminal investigation by the IRS); *Van Bourg*, 751 F.2d at 983, 985 (applying Exemption 7(A) to a pending unfair labor practices investigation). That the Army Corps generally anticipates law enforcement involvement in securing the pipeline does not bring the email and attachment within Exemption 7(A)'s protections for enforcement proceedings. The Army Corps' proffered reasons for withholding the email and attachment are worthy concerns, but they are not protected by Exemption 7(A).

## 2. Army Corps' redacted email (USA_ACE_00065)

The Army Corps redacted several lines from an email by its public affairs officer to representatives from various agencies under Exemption 5's deliberative

23

process privilege. (Doc. 35-1 at 65.) The Army Corps' *Vaughn* index explains the "[r]edacted material contains author's characterization of editorial remarks made by Mr. Nash during interagency discussions. Those remarks express concerns and reflect possible course of action in response that are, at this time predecisional as no final decisions have been made to address potential security concerns." (Doc. 30-1 at 4.) Bartlett's declaration describes the redaction as "one paragraph in an interagency email" and further explains "[t]he information withheld from the interagency email consisted of a paragraph containing editorial comments expressing concern and reflecting possible course of action made during interagency discussions." (Doc. 30 at ¶ 10.)

The email was sent from Army Corps personnel to State Department, BLM, Department of the Interior, and other Army Corps employees, satisfying Exemption 5's threshold requirement that it is an "inter-agency or intra-agency" document. However, like with the email and attachment discussed above, the Army Corps has not shown the email is "predecisional." The agency has not explained whether the redacted communication occurred as part of a distinct decisionmaking process, as required under Exemption 5, or as part of a routine or ongoing process. *See Lahr*, 569 F.3d at 981. Accordingly, the Army Corps has not justified the redaction.

**3.      BLM's redacted communication plan (USA_BLM_00043)**

24

BLM redacted one paragraph from its communication plan for the Keystone XL pipeline under Exemption 5's deliberative process privilege. (Doc. 35-2 at 60.) In describing the redaction, BLM's *Vaughn* index states only that the "[m]aterial includes internal speculation and concerns about law enforcement and possible impacts to communities." (Doc. 31-1 at 2.) A declaration submitted by Sally Sheeks, a Government Information Specialist with BLM, explains only that "[t]hrough the assertion of the deliberative process privilege of Exemption 5, the BLM withheld internal communications which reflect speculation and concerns of law enforcement officers. The release of these communications would hinder candid discussion in the course of conducting law enforcement duties." (Doc. 31 at ¶ 13.)

BLM has not provided any information about the creation of the communication plan, but on its face the plan appears to be an intra-agency document subject to Exemption 5. However, BLM has failed to show the redacted portion of the communication plan is predecisional and deliberative. In its opening brief, BLM argues the plan is predecisional because it was "created to assist the agency decision maker in developing a plan for community engagement." (Doc. 42 at 33). But, as the ACLU argues, the communication plan is the final decision on BLM's strategy for discussing the Keystone XL pipeline. BLM contends that the "Month 00" placeholder on the first page is evidence the document is a draft.

25

But after considering the entire document, it is clear the 10-page plan represents BLM's decision about how to present the Keystone XL pipeline's approval to the public. A single placeholder—likely forgotten—does not negate the finality evident in the document.

In its response brief, BLM changes course and argues the document is predecisional to the agency's decision to grant a right of way for the pipeline. (Doc. 55 at 27–28.) But even if the communication plan was issued before the right of way decision chronologically, it is not predecisional for purposes of the deliberative process privilege. "Material which predates a decision chronologically, but did not contribute to that decision, is not predecisional in any meaningful sense." *Assembly*, 968 F.2d at 921. Here, the communication plan did not play any substantive role in the right of way decision but was "prepared solely for the purpose of post-decision dissemination." *Id.* Accordingly, it is not predecisional.

This is consistent with the purpose of the deliberative process privilege "to prevent injury to the quality of agency decisions." *Sears*, 421 U.S. at 151. That purpose is accomplished "as long as prior communications and the ingredients of the decisionmaking process are not disclosed." *Id.* However, consistent with the mandate to construe FOIA exemptions narrowly, *see Rose*, 425 U.S. at 361, documents that are peripheral to the agency's decision are not protected by the

deliberative process privilege, *see Assembly*, 968 F.2d at 921. The key inquiry is whether disclosure would harm the agency's decisionmaking process. *See id.* at 920; *Sears*, 421 U.S. at 151. Disclosure of a document that played no role in the substantive decision, like the communication plan here, will not discourage candid exchanges within the agency in the future.

As a final matter, the communication plan carries none of the hallmarks of a "deliberative" document. It does not express suggestions or concerns about possible courses of action, nor does it include any editorial comments or proofreading marks, either of which would reflect the views of an individual rather than the agency. *See Maricopa*, 108 F.3d at 1094. Rather, the communication plan appears to be a final statement of BLM's official communication strategy. *See Sierra Club*, 925 F.3d at 1012. It is not protected by Exemption 5's deliberative process privilege.

### 4. BLM's redacted email (USA_BLM_00017-2)

BLM redacted the body of an email from Jim Stobaugh, a National Project Manager in its Nevada office, to Karan Dunnigan, an attorney with the Department of the Interior, under Exemption 5's attorney client privilege. (Doc. 35-2 at 19.) In describing the redaction, BLM's supplemental *Vaughn* index explains the

[m]aterial includes confidential communications between [BLM] and counsel in the Office of the Solicitor for the purpose of relaying facts to counsel and seeking legal advice on agency action. In the e-mail, Jim Stobaugh of BLM discusses what he believed to be BLM's

27

forthcoming actions. He also asks Karan Dunnigan of the Solicitor's Office about the content of and agency response to the attached Presidential Memorandum.

(Doc. 53-1 at 1.) Sheeks's declaration states that "[t]hrough the assertion of the attorney-client privilege of Exemption 5, the BLM protected communications between BLM employees that incorporate legal advice provided by the United States Attorney's Office." (Doc. 31 at ¶ 13.)

The ACLU argues there is no evidence that Stobaugh was seeking legal advice. For support, it relies on Dunnigan forwarding the email to another BLM employee with the message "Just FYI, this is Jim Stobaugh's take on further NEPA." (Doc. 35-2 at 18.) The ACLU claims this message shows Stobaugh was seeking policy advice, which is not covered by the attorney-client privilege. The ACLU's argument is speculative. BLM submitted declarations that the email involved legal advice, (Doc. 31 at ¶ 13; Doc. 53-1 at 1), and the forwarded message suggests the advice was whether further NEPA analysis was legally required. BLM's *Vaughn* index establishes that Stobaugh's email was a confidential communication between a client and an attorney to obtain legal advice. *See Martin*, 278 F.3d at 999. Given the presumption of good faith afforded to agency declarations, *Hamdan*, 797 F.3d at 772, BLM has sufficiently justified its redaction of the email pursuant to the attorney-client privilege.

## III.  *Glomar* Response

The ACLU argues the FBI's *Glomar* response was unjustified.  An agency

issuing a *Glomar* response to a FOIA request refuses to confirm or deny the

existence of certain records.  *Minier*, 88 F.3d at 800.  The term comes from the

case *Phillippi v. CIA,* in which the CIA refused to confirm or deny its connection

to a ship named the *Hughes Glomar Explorer*.  546 F.2d 1009, 1011 (D.C. Cir.

1976).  *Glomar* responses "are permitted only when confirming or denying the

existence of records would itself cause harm cognizable under an FOIA

exception."  *Roth v. Dep't of Justice*, 642 F.3d 1161, 1178 (D.C. Cir. 2011)

(internal quotation marks omitted).  The inquiry is "whether the existence or

nonexistence of documents . . . is itself a fact exempt from disclosure."  *Florez v.

CIA*, 829 F.3d 178, 182 (2d Cir. 2016).  To justify a *Glomar* response, an agency

may submit a detailed affidavit explaining how the fact that a document may or

may not exist falls within a FOIA exemption.  *See Minier*, 88 F.3d at 800.

Here, the FBI bases its *Glomar* response on Exemptions 7(A) and 7(E).  As

discussed above, Exemption 7(A) applies to "records or information compiled for

law enforcement purposes" when disclosure "could reasonably be expected to

interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A).  Exemption

7(E) applies to

> records or information compiled for law enforcement purposes, but
> only to the extent that the production . . . would disclose techniques and

29

procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

5 U.S.C. § 552(b)(7)(E).

To support its *Glomar* response, the FBI submitted a declaration by David Hardy, the Section Chief of its Information Management Division Record/Information Dissemination Section. (Doc. 32.) Hardy claims a *Glomar* response is appropriate under Exemption 7(A) because acknowledging responsive records could confirm the FBI has detected threats to the pipeline, while admitting a lack of responsive records could indicate the FBI has failed to detect threats. (*Id.* at ¶¶ 20–21.) With respect to Exemption 7(E), Hardy generally argues that acknowledging the existence or nonexistence or records related to techniques and procedures would undermine the FBI's investigative strategy. (*Id.* at ¶¶ 24–30.)

The ACLU does not respond in terms of the exemptions the FBI has claimed. Instead, it argues that because BLM's disclosures in this case reveal the FBI has responsive records, the FBI can no longer pretend the records may or may not exist. (Doc. 46 at 57–61.) An agency is precluded from issuing a *Glomar* response if it has "officially confirmed" or "officially acknowledged" the information sought in a FOIA request. *Pickard v. Dep't of Justice*, 653 F.3d 782, 786 (9th Cir. 2011). The Ninth Circuit has not elaborated on what it means for an agency to "officially" confirm or acknowledge a record. *See id.* However, other

30

circuits have held that the rule "is limited only to official and public disclosures made by the same agency providing the *Glomar* response." *Florez*, 829 F.3d at 186; *Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999). Accordingly, the FBI has not waived its *Glomar* response merely because BLM disclosed relevant information. However, in reviewing the FBI's justification for its *Glomar* response, the Court is not limited to reviewing the agency's affidavit but can consider the whole record. *See Florez*, 829 F.3d at 187. BLM's disclosures revealing responsive FBI documents are relevant to whether the FBI has sufficiently explained that the records' existence or nonexistence is exempt from disclosure. *See id.* The FBI must show the harm contemplated by the claimed exemptions is likely to occur, notwithstanding BLM's disclosures.

The ACLU also argues that Hardy's declaration merely explains how disclosure of certain records would cause harm but does not justify how disclosure of the records' *existence or nonexistence* would cause harm. The ACLU is correct as to the FBI's Exemption 7(E) claims. Hardy repeatedly makes statements like "disclosure of records, should they exist" and "[d]isclosure of these documents, should they exist" to explain the harm under Exemption 7(E). (Doc. 32 at ¶¶ 25–28.) But these explanations go to the content of the records, not their existence or nonexistence. Hardy has not adequately explained how the fact the records may or may not exist is protected under Exemption 7(E). Accordingly, the FBI has not

justified its *Glomar* response under Exemption 7(E).

Ultimately, though, the FBI has justified its *Glomar* response under Exemption 7(A). At the threshold, the FBI has met the low bar of showing its responsive records, should they exist, would have been "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7); *ACLU*, 881 F.3d at 780–81. As for the second step of the Exemption 7(A) inquiry—whether disclosure would interfere with enforcement proceedings—Hardy explains disclosing the existence or nonexistence of responsive records "would not only confirm threats have been detected, it would also disclose the scope of the FBI's investigative capabilities and vulnerabilities" and "would alert the public of the FBI's level of interest and scope of resources available to thwart the threat(s), and afford criminals and/or terrorists the opportunity to alter their behaviors." (Doc. 32 at ¶ 20.) Hardy continues that "[c]onfirmation of the existence of responsive records would be equivalent to the FBI acknowledging there is an active investigation." (*Id.*)

The argument that the more records the FBI has, the more investigation it has done, is logical. As the FBI argues, BLM's disclosures referencing FBI involvement in meetings and emails about pipeline security do not reveal the scope of the FBI's current investigations, if any. (Doc. 55 at 37–38.) BLM's disclosures, then, do not undermine the FBI's *Glomar* response. Hardy could be more specific about the relationship between protected protests and threats to the pipeline. But

32

given "the FBI should be accorded special deference in an Exemption 7 determination," *ACLU*, 881 F.3d at 779 (internal quotation marks omitted), Hardy's declaration is sufficient to justify the FBI's *Glomar* response under Exemption 7(A).

## CONCLUSION

IT IS ORDERED that the agencies' motion for summary judgment (Doc. 40) is GRANTED IN PART as follows:

1. BLM's redaction of the email labeled USA_BLM_00017-2 under Exemption 5's attorney client privilege was proper.

2. The FBI's *Glomar* response was proper under Exemption 7(A).

The motion (Doc. 40) is DENIED in all other respects.

IT IS FURTHER ORDERED that the ACLU's motion for summary judgment (Doc. 45) is GRANTED IN PART as follows:

1. The Army Corps' search was inadequate.

2. BLM improperly redacted its communication plan labeled USA_BLM_00043 under Exemption 5's deliberative process privilege.

3. The Army Corps improperly withheld the email labeled USA_ACE_000008–12 under Exemptions 5 and 7(A) and improperly redacted the email labeled USA_ACE_00065 under Exemption 5.

The ACLU's motion (Doc. 45) is DENIED in all other respects.

IT IS FURTHER ORDERED:

1. Within sixty (60) days of the date of this Order, the Army Corps shall conduct another search that encompasses its Omaha District office.

2. Within thirty (30) days of the date of this Order, BLM shall disclose its communication plan in full and the Army Corps shall disclose the email and attachment labeled USA_ACE_000008–12 and the email labeled USA_ACE_00065.

There being no issues remaining, the Clerk of Court is directed to enter judgment consistent with this Order and close the case.

DATED this 21st day of August, 2019.

15:05 P.M.

Donald W. Molloy, District Judge
United States District Court